**Robert C. SCHELL and Liberty Mutual Insurance Company, Appellants,**

**v.**

**AMF, INCORPORATED, Defendant and Third-Party Plaintiff,**

**v.**

**CAPITAL BAKERS, INC., Third-Party Defendant.**

**No. 77–1143.**

United States Court of Appeals, Third Circuit.

Argued Oct. 7, 1977.

Decided Dec. 22, 1977.

[redacted]

James K. Thomas, James K. Thomas, II, Thomas & Thomas, Harrisburg, Pa., for appellee, AMF, Inc.

James F. Carl, Metzger, Wickersham, Knauss & Erb, Harrisburg, Pa., for appellee, Capital Bakers, Inc.

Philip D. Freedman, Caldwell, Clouser & Kearns, Harrisburg, Pa., for appellants.

Before GIBBONS and WEIS, Circuit Judges and WRIGHT, District Judge.*

OPINION OF THE COURT

WEIS, Circuit Judge.

At issue in this appeal are the roles of court and jury in determining whether a manufacturer was liable under Restatement (Second) of Torts § 402A for an alleged design defect. Plaintiff contends his injury was the result of inadequate protection from moving gears on a machine he was operating. The manufacturer's defense is that the design it utilized was adequate for normal use. After weighing the relevant

* The Honorable Caleb M. Wright, United States District Court for the District of Delaware, sitting by designation.

considerations, we determine that the question should be decided by a jury.

Plaintiff Robert Schell was seriously injured when his arm became caught in the sprockets of a machine manufactured by the defendant AMF, Incorporated. He brought a diversity action in the district court alleging liability under Pennsylvania law adopting § 402A. The case was tried to a jury which was unable to agree upon a verdict. Thereafter, the district court entered judgment for the defendant pursuant to Fed.R.Civ.P. 50(b).

Plaintiff was employed by Capital Bakers, Inc. in Harrisburg, Pennsylvania. His usual duties were to feed baking pans into a machine called a Pan–O–Mat. On March 13, 1972, about 15 minutes before the accident occurred, he was called upon to operate the machine, a task apparently he had not performed previously.

The Pan–O–Mat is designed to receive roll-shaped pieces of dough from another machine and place them on baking pans. The Pan–O–Mat's chief component is a series of cups which are attached to a conveyor assembly. The cups receive the dough and then carry it upward. Occasionally pieces of dough not properly directed miss the cups and fall to the floor. In order to collect the falling dough, the Pan–O–Mat is equipped with an "excess tray" which slides beneath it on the floor.

The conveyor is driven by a series of chain and sprocket drives within the machine. Access to the drive mechanism is secured through a door on each side of the machine. The door bottom is approximately six inches above the floor and the excess tray fits into this space. When it is necessary to remove an accumulation of dough on the tray, usually it may be pulled out and reinserted without opening a door or shutting down the machine. The baking industry's sanitation standards require that the area behind the doors be accessible for cleaning, a procedure which Capital carried out at least every four hours.

One of the Pan–O–Mat operators' duties is to prevent undue accumulation of dough in the excess tray. When Schell began to operate the machine, he observed that an excessive amount of dough had piled up, so much in fact, it was necessary to open the door to remove the tray. With the assistance of another employee, he pulled the tray from underneath the machine. Before the tray could be removed, however, the other employee was called away and because it was too heavy for one man, Schell left it on floor near the Pan–O–Mat. Since there was no replacement tray available, the misguided dough fell to the floor beneath the machine.

Schell left the area and returned within an estimated time of two to ten minutes. In the meantime, the machine continued to run with the door open and dough piled up on the floor near the door. Schell got down on his hands and knees in order to brush the dough away from the machine and put his right hand into the now accessible machinery area. Because he slipped, or for some other reason, Schell lost his balance and his arm became entangled in the mechanism. His arm was injured so severely that it had to be amputated.

At trial the plaintiff produced an expert who testified that the machine was defective because:

1. It lacked an interlock mechanism which would have caused the conveyor to stop whenever a door was opened.

2. There was no warning on the doors.

3. The doors could be opened easily and quickly without opportunity for reflection.

The expert testified that in 1956, when the machine was manufactured, an interlock device could have been incorporated for about $25.00.

There was no dispute that an interlock was both feasible and practical. No testimony was presented as to the exact cost of the machine, but there was evidence that the price of the Pan–O–Mat was between $5,000 and $9,000. Although witnesses testified that the doors should not be open while the machine was operating, there was also evidence that when the machine was shut down for even a short time during

production, dough would stick to the cups and had to be removed before operation could continue.

In entering judgment for the defendant, the district court relied upon *Bartkewich v. Billinger*, 432 Pa. 351, 247 A.2d 603 (1968), and concluded that Pan–O–Mat lacked no safety device which caused an injury of the type that could be expected from the machine's normal use. Schell's actions were said to have created a risk to himself against which AMF had no duty to guard.

Pennsylvania has adopted § 402A of the Restatement (Second) of Torts, *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), and imposes strict liability for defect in design as well as in the manufacture of products.[1] Lack of proper safety devices can constitute a defective design for which there may be recovery under § 402A. *Bartkewich v. Billinger, supra*, 432 Pa. at 354, 247 A.2d at 605.

The circumstances here are similar in some respects to those present in *Bartkewich*. There, the plaintiff was operating a machine which broke up glass. No guard was provided which would have prevented the operator from putting his hand into the area where the glass was being fragmented. While the machine was running, the plaintiff, an experienced operator, saw that glass was beginning to jam. Rather than using wooden sticks which had been provided for that purpose, he reached in with his hand to loosen the obstruction. His glove became caught in the mechanism and his hand was injured.

The Pennsylvania Supreme Court opinion dwells upon plaintiff's voluntary exposure to danger and the normal use to which the machine was to be put. Views conflict, however, whether the court decided the case on the basis of the condition of the machine, *see, e.g., Elder v. Crawley Book Machinery Co.*, 441 F.2d 771, 773 n. 2 (3d Cir. 1971), or assumption of risk, *see, e.g., Colosimo v. May Department Store Co.*, 466 F.2d 1234, 1236 (3d Cir. 1972) (Hastie, J., concurring), *Greco v. Bucciconi*, 407 F.2d 87 (3d Cir. 1969). In the case *sub judice*, neither interpretation controls.

Unlike *Bartkewich*, where the plaintiff deliberately placed his hand in the dangerous part of a machine, here Schell intended to reach for dough which was on the floor below the drive mechanism. According to his testimony, it was his loss of balance which caused his hand to come into contact with the conveyor sprockets. In the plaintiff's version, he neither intended nor anticipated placing his arm so close to the sprockets and it was for the jury to determine whether assumption of risk had been

---

1. Section 402A provides:

   "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

   (a) the seller is engaged in the business of selling such a product, and

   (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

   (2) The rule in subsection (1) applies although

   (a) the seller has exercised all possible care in the preparation and sale of his product, and

   (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

   Comment *n* explains:

   "Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

   In *Ferraro v. Ford Motor Co.*, 423 Pa. 324, 223 A.2d 746 (1966), the Pennsylvania Supreme Court adopted the assumption of risk defense as a supplement to its recognition of strict liability in *Webb v. Zern, supra. See generally* Twerski, Old Wine in a New Flask—Restructuring Assumption of Risk in the Products Liability Era, 60 Iowa L.Rev. 1 (1974).

established, or whether plaintiff's conduct was inadvertent.[2] It cannot be said in the circumstances of this case that plaintiff was guilty of assumption of risk as a matter of law. *Elder v. Crawley Book Machinery Co., supra; cf. Green v. Sanitary Scale Co.*, 431 F.2d 371 (3d Cir. 1970) (en banc).

We therefore must assess whether the condition of the machine itself constituted a defective design for which there may be recovery under § 402A. *Bartkewich* says that the design defect rule applies to allow recovery "where the absence of the safety device caused an accidental injury which was of the type that could be expected from the normal use of the product." 432 Pa. at 354, 247 A.2d at 605. The manufacturer is "entitled to believe that the machine would be used in its usual manner, and need not be an insurer for the extraordinary risks an operator might choose to take." *Id.* at 356, 247 A.2d at 606. Pennsylvania thus requires that there be a determination of the normal use of a product and the ordinary risk that might be expected to be taken in its operation.

The purpose of the machine used by Bartkewich and that operated by Schell are significantly different. The glass-breaking machine of necessity required an opening into which the glass is pushed—an opening in which devices strong enough to break glass (and mangle arms) must necessarily operate. If such an opening were not provided, the machine could not function in its productive capacity.

By contrast, in the Pan–O–Mat production operation, the conveyor drive mechanism did not have to be exposed. In fact, the machinery was covered by protective housing. Only when a guard door was open was there a risk to the operator of entanglement in the sprockets and only during cleaning operations was it normally necessary for a door to be open. By shielding the sprockets, the manufacturer recognized the hazard of leaving them exposed during normal operation. The question then becomes whether the court can conclude as a matter of law that a machine with an easily opened door which could remain ajar while the drive mechanism was operating was equipped with adequate protective devices at the time of manufacture in 1956. *Suchomajcz v. Hummel Chemical Co.*, 524 F.2d 19, 28 (3d Cir. 1975); *Dorsey v. Yoder Co.*, 331 F.Supp. 753, 761 & n. 12 (E.D.Pa.1971), *aff'd sub nom. Yoder Co. v. General Copper & Brass Co.*, 474 F.2d 1339 (3d Cir. 1973); *cf. Ward v. Hobart Manufacturing Co.*, 450 F.2d 1176, 1182 (5 Cir. 1971).

The door was located at a point where the manufacturer knew that dough would collect, as evidenced by the fact that the excess tray was provided to facilitate removal. We cannot say it is unreasonable to expect that on occasion dough would build up so high that it could not be removed except by opening the door and exposing the dangerous machinery parts. *See Greco v. Bucciconi Engineering Co., supra; La Gorga v. Kroger Co.*, 275 F.Supp. 373, 379–80 (W.D.Pa.1967), *aff'd on other grounds*, 407 F.2d 671 (3d Cir. 1971).[3]

We are persuaded that *Bartkewich v. Billinger, supra*, does not require that the court conclude as a matter of law that in these circumstances the manufacturer is entitled to ignore the possibility that, under pressure to maintain uninterrupted production, a working force with low safety consciousness would work around the exposed drive train while it continued to operate. Rather, it is consistent with the *Bartkewich* approach to inquire whether the manufacturer was justified in believing that the machinery would be used in its normal manner (with the doors closed) and not anticipate that an operator would take some risk in removing the dough from the

---

**2.** *See* Twerski, *supra*, 60 Iowa L.Rev. at 16–25. *See also* Noel, Defective Product: Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. 93 (1972).

**3.** Compare *e.g., Schreffler v. Birdsboro Corp.*, 490 F.2d 1148 (3d Cir. 1974), where we held

that the manufacturer was not liable for an employee's injury where the employer substantially modified the machinery and adopted a use for it which could not have been anticipated by the manufacturer in its original design.

area near the drive assembly. In *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321 n. 13, 319 A.2d 914, 921 n. 13 (1974), the Pennsylvania Supreme Court observed that the principle of foreseeability carries over from traditional negligence to strict liability cases and "whether a particular use of a product is abnormal depends on whether the use was reasonably foreseeable by the seller." *Cf.* Restatement (Second) of Torts § 402A, comment *h*; § 395, comments *j, k. See also* Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk*, 25 Vand.L.Rev. 93 (1972).

In the circumstances of this case the issues should be resolved by the jury. We have taken into account such considerations as (1) the social utility of the Pan–O–Mat, (2) the expected expertise of the manufacturer in a highly specialized field, (3) the simplicity, feasibility and low cost of an interlock, (4) the fact that the interlock would be an improvement over the existing safety device (the door) although not foolproof, (5) the use of an interlock would not impair the efficiency of the Pan–O–Mat to any measurable extent, (6) an injury caused by entanglement with moving gears and sprockets is apt to be serious.[4]

We do not deem it necessary to analyze the factors which may be involved in the other two contentions raised by plaintiff— the design of the door fastener and the failure to attach a warning to the machine. As to the latter item, particularly, there are substantial difficulties in a concept that a warning is always an adequate answer to the problem of product safety.[5]

We believe the issues in this case should not have been ruled on as a matter of law. Accordingly, the judgment of the district court will be vacated and the matter remanded for a new trial.

---

4. *See* Twerski, Weinstein, Donaher & Piehler, The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age, 61 Cornell L.Rev. 495, 524–40 (1976).

5. There is an element of futility in requiring a warning of obvious dangers, *e.g.*, requiring that a notice be attached to a knife warning that it might cut fingers. And, as a matter of policy, it is questionable whether a manufacturer which produces a machine without minimal

available safeguards is entitled to escape liability by warning of a dangerous condition which could reasonably have been avoided by a better design. *See generally id.*, where the authors thoroughly explore the pitfalls of a court adopting an approach of "when in doubt, warn," and decry the trend of overwarning, encouraged in part by this *apparently* inexpensive mode of dealing with risks in products. *Id.* at 513.