Mark W. **HECKMAN**

v.

**THE FEDERAL PRESS COMPANY,**
**Appellant.**

**ALLEN BRADLEY COMPANY c/o**
**Corporation Trust Company**

v.

**CLARK EQUIPMENT COMPANY,**
**BROWN TRAILER DIVISION.**

No. 78–1173.

United States Court of Appeals,
Third Circuit.

Argued Sept. 28, 1978.

Decided Nov. 27, 1978.

As Amended Jan. 3, 1979.

Francis E. Marshall, Charles W. Craven, Marshall, Dennehey & Warner, Philadelphia, Pa., for appellant, The Federal Press Co.

Joseph Lurie, Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., for appellee, Mark W. Heckman.

William C. Foster, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., for Clark Equipment Co.

Before ROSENN and WEIS, Circuit Judges and FISHER, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this products liability case, a jury found that a power press manufactured by defendant without a guarding device was unreasonably dangerous, and awarded plaintiff damages for the injuries he sustained while operating the machine. Although the question of liability was for the jury, the judgment must be vacated because of error in permitting expert testimony that included a "growth factor" in projecting future loss of earnings. Admission of such evidence being impermissible under applicable Pennsylvania law, we grant a new trial.

Plaintiff's left hand was severely injured when it was caught in a power press he was operating in the course of his employment with the Clark Equipment Company. He brought suit against The Federal Press Company, the manufacturer of the machine, alleging defective design because of the lack of an adequate safety device. A jury returned a verdict in favor of the plaintiff in the amount of $750,000 against Federal, with a verdict over against the employer Clark, joined by Federal on a claim for contribution.

The accident occurred on September 24, 1972, at the Clark factory in Reading, Pennsylvania as Heckman was using a foot pedal to operate the press. The machine functions by dropping a heavy ram onto a die, cutting or shaping the metal which rests on the lower surface. As plaintiff placed a piece of metal in the machine to be cut, the ram came down on his hand, resulting in the amputation of several fingers and other damage.

The press had been purchased by Clark in 1970. It could be operated in two different ways: with hand controls requiring the use of both hands on switches away from the point of operation, or, alternatively, by the use of a foot pedal, an optional item ordered by Clark. When the manual operation was used, the employee's hands necessarily were protected. However, when the foot pedal was utilized without a guard, there was nothing to prevent the hands from being placed in the operating area directly under the descending ram.

Federal did not provide safety appliances other than the dual buttons for manual operation except upon the customer's spe-

---

* Honorable Clarkson S. Fisher, United States District Court for the District of New Jersey, sitting by designation.

cific request and at its expense. When ordered, the guards were secured from other sources and attached by Federal. On delivery of the equipment to Clark, Federal sent a letter suggesting, *inter alia*, that the customer "obtain, install, and use 'point of operation' guarding for greater operator safety." In addition, the press itself had a warning plate with similar instructions for use.

Various types of safeguards designed to protect the operator were available on the market, including some designed to accommodate specific uses of the multi-purpose machine. Clark did in fact purchase a point-of-operation guard for $100, but it was not on the press at the time the injury occurred, and, in any event, its efficacy was challenged. Plaintiff produced expert testimony to establish that at least one type of appliance would be effective in about 95% of the customary uses of the press, and that the failure to supply such a device made the press defective within the meaning of Restatement (Second) of Torts § 402A (1965).

Federal contended it was not customary in the trade to furnish guards except upon request, and the multitude of uses to which the machine could be put made it impracticable to designate any one device as standard equipment. Moreover, Clark's failure to heed Federal's warning was said to be a superseding cause absolving defendant from all liability. Finally, Federal relied upon state regulations placing responsibility for the safe operation of presses upon employers and employees.

In presenting his damages, plaintiff testified that he had finished three years of college, but had decided not to complete the degree requirements. Thereafter, he worked briefly as a management trainee in a clothing store and as a mason's helper before joining Clark in February, 1972 as an assemblyman making truck trailers. Within months, he was promoted to work on presses where he received $4.15 per hour, a position he occupied for only 20 days before the accident occurred.

Following his injury, plaintiff was away from work for five weeks during which he underwent surgery for his mangled hand. On his return to Clark, he was assigned the duties of a clerk at $3 per hour. Some months later, after determining the clerk position had no future, plaintiff returned to college and graduated in due course. At the time of trial, he was within a few months of achieving a Master's Degree in Public Administration, with a concentration in labor relations. Upon completion of his graduate studies, plaintiff expected to secure a position with a governmental agency at a starting salary of approximately $9,000 per year, increasing to $12,000 or $13,000 within three years.

A vocational expert projected that, had the accident not occurred, plaintiff would have become a tool and die maker at an annual income of $14,560. However, because of the disability to his left hand, plaintiff would have to resort to the free labor market where the annual income would be $6,240, an annual loss of future earnings, according to the expert, of $8,320. On this basis, plaintiff's actuary computed the present value of future loss of earnings to be $151,423, to which he added a 3% "growth factor," for a total of $235,231. Medical expenses were $2,477.83, and the loss of wages for the period immediately following the accident was $960, with an additional $460 differential during the time plaintiff worked as a clerk for Clark before returning to college.

In answer to interrogatories, the jury found that Federal had sold a press in a defective condition, Clark Equipment Company was negligent, and plaintiff Heckman had not assumed the risk. It awarded Heckman damages of $750,000. Motions for judgment n.o.v., and for a new trial were filed by both Federal and Clark, and Federal also asked in the alternative for a remittitur. After argument, all motions were denied without opinion by the district court. Only Federal has appealed.

## LIABILITY

The parties are in agreement that in this diversity case Pennsylvania's substantive law controls. In *Webb v. Zern*, 422 Pa.

424, 427, 220 A.2d 853, 854 (1966), Pennsylvania adopted the strict liability provisions of § 402A of the Restatement (Second) of Torts. Cases interpreting this section have held that lack of proper safety devices can constitute a defective design which may subject the manufacturer of machinery to liability. *Schell v. AMF, Inc.*, 567 F.2d 1259, 1261 (3d Cir. 1977); *Bartkewich v. Billinger*, 432 Pa. 351, 354, 247 A.2d 603, 605 (1968).

We find the present case quite similar on its facts to *Capasso v. Minster Machine Co.*, 532 F.2d 952 (3d Cir. 1976), which also discussed a power press injury. There, as here, a two button system provided protection in manual operation, but no guard was provided when the optional foot control pedal was used. The manufacturer failed to provide any proposals for a safety guard and a device of the customer's own design proved to be ineffective. We held that since the original purchase included the optional foot switch, its use did not as a matter of law constitute a "substantial change" in the machinery within the scope of § 402A(1)(b) absolving the manufacturer; nor did the use of the inadequate shield act as a superseding cause as a matter of law. *Cf. Hanlon v. Cyril Bath Co.*, 541 F.2d 343, 345–46 (3d Cir. 1975); *Schreffler v. Birdsboro Corp.*, 490 F.2d 1148, 1154 (3d Cir. 1974). We concluded that the issue of a defect in the press at delivery was for the jury.

Similarly here, plaintiff's expert maintained that the defendant should have provided safeguards to be used in connection with the foot pedal operation, and that effective implements were available at a reasonable cost. *See Schell v. AMF, Inc., supra* at 1260.

Federal asserts that the bolster plate which Clark had installed blocked the operator's view of the machine's warning plate, and that this screening constituted a superseding cause insulating the manufacturer from liability.[1] Thus, Federal's theory is that when Clark obscured the warning sign it effected a substantial change that became a superseding cause of the accident. But it cannot be said that as a matter of law the decreased visibility of the plaque was such a major departure from the original design of the machine as to cut off the manufacturer's obligations. *Cf. Schreffler v. Birdsboro Corp., supra* at 1154. Particularly is this so when the sign was addressed to a condition that was not latent. We are unwilling to accept the proposition that the warning plate in and of itself absolved Federal as a matter of law. As we observed in *Schell v. AMF, Inc., supra* at 1263, n.5:

> "[A]s a matter of policy, it is questionable whether a manufacturer which produces a machine without minimal available safeguards is entitled to escape liability by warning of a dangerous condition which could reasonably have been avoided by a better design."

In the circumstances here, the warning issue was for the jury as was the defense of assumption of the risk. *Elder v. Crawley Book Machinery Co.*, 441 F.2d 771, 773–74 (3d Cir. 1971).

Federal also maintains that it was exculpated as a matter of law because regulations of the Pennsylvania Department of Labor and Industry requiring the use of point-of-operation devices placed the responsibility upon the employer and employee. We do not accept this premise. Whatever effect the regulations might have as between employer and employee does not extend to relieve the manufacturer of its liability under § 402A as a matter of law.[2]

---

1. The plaque read in part: "Never use this machine without guards or safety devices that will prevent hands from remaining in die space while flywheel is in motion."

2. Although plaintiff's expert was cross-examined at length about the state regulations, defendant was not permitted to introduce them in evidence apparently because of a failure to

show they were in effect either on the day of the accident or at the time the machine was purchased. We would assume that if the defendant establishes a proper foundation, the regulations would be admissible in the retrial as having some relevance to whether the manufacturer could expect the buyer to install safety equipment.

If a manufacturer fails to provide reasonable safety devices for a product and thus creates an unreasonable risk of harm to the user, the fact that the manufacturer may expect the user to provide a protective appliance is not sufficient to preclude liability in most circumstances. *See Bexiga v. Havir Manufacturing Co.*, 60 N.J. 402, 411, 290 A.2d 281, 285 (1972). *See also Dorsey v. Yoder Co.*, 331 F.Supp. 753, 761–62 (E.D.Pa. 1971), *aff'd mem.*, 474 F.2d 1339 (3d Cir. 1973). The issue is one which should be decided by a jury in light of such matters as the feasibility of incorporating safety features during manufacture of the machine, the likelihood that users will not secure adequate devices, whether the machinery is of a standard make or built to the customer's specifications, the relative expertise of manufacturer and customer, the extent of risk to the user, and the seriousness of injury which may be anticipated.

Finally, the defendant relies upon this court's recent decision in *Verge v. Ford Motor Co.*, 581 F.2d 384 (3d Cir. 1978). In that case, the court was confronted with the question whether the primary manufacturer of a product should be held liable for a design defect when secondary manufacturers also made substantial contributions to the finished product. The problem posed was allocating liability among parties who participated in the design and creation of the product—not, as here, where the product has been sold in its finished state and the purchaser is a party. Thus, the cases are distinguishable and *Verge* is not controlling here.

We conclude that the questions of liability were for the jury's consideration and it was not error to deny Federal's motion for judgment n.o.v.

## DAMAGES

█ A significant factor in the plaintiff's claim for damages was impairment of earning capacity. In his computation of the loss of future earnings, plaintiff's expert witness included a projected annual "growth factor of 3%." We passed upon similar testimony in *Vizzini v. Ford Motor Co.*, 569 F.2d 754 (3d Cir. 1977), an opinion filed after trial of this case in the district court. *Vizzini* observed that the courts of this country are not in agreement on the issue, but accepted *Havens v. Tonner*, 243 Pa.Super. 371, 365 A.2d 1271 (1976) (allocatur denied), as delineating Pennsylvania law on the subject. In *Havens*, the Pennsylvania Superior Court concluded that generally evidence of this nature is simply a substitute for that candidly addressed to future inflation, and, because of the highly speculative character of such testimony, it is not admissible. In *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 144 (3d Cir. 1973), and *Magill v. Westinghouse Electric Corp.*, 464 F.2d 294, 300–01 (3d Cir. 1972), we had adopted a similar interpretation of Pennsylvania law, although not foreclosing admission if the evidence were supported by a proper foundation. *Vizzini* views *Havens* as narrowing the leeway offered by *Magill* and *Hoffman*. In any event, the evidence here would not have qualified under either of those cases.

We do not overlook the argument that failing to recognize inflation is unrealistic,[3] but the challenged evidence must be placed in context. Any testimony as to the future earnings of a particular individual is speculation of the most obvious kind because its basic premise, the time that the person would have worked had not the injury occurred, is simply not determinable. Expectancy or statistical data about a group do not establish concrete facts about an individual. An attempt to make what is at best a sheer guess more precise by introducing another uncertain factor is not apt to improve the accuracy of a calculation whose foundation is flawed. The same argument applies to the Pennsylvania rule of reducing future earnings to present worth by an annual discount rate of 6% simple interest. If the gross earnings are merely conjectural, reducing them to present worth does

---

3. *See* Note, Future Inflation, Prospective Damages, and the Circuit Courts, 63 Va.L.Rev. 105 (1977).

not make them any more factual. To the extent, however, that today's interest rates from high quality investments exceed 6% there is indeed a pro tanto inflationary adjustment.

Moreover, we do not believe that plaintiff is in a position to complain of any unfairness in projecting future wage losses under Pennsylvania law. It, after all, uses gross rather than net income after taxes as the measure. There are few who do not expect inflation to continue, but there are even fewer who believe that a person's wages in the future will not be subjected to both federal and state income tax, as well as Social Security, deductions. If the Pennsylvania law on computation of future earnings is to be revised, it should be on a broad scale, addressing more than the inflation factor. That formulation, however, is a concern of state law and it is not appropriate for this court to undertake the task. The use of the 3% growth factor in calculating plaintiff's loss of future earnings in itself constituted reversible error.[4]

Since this case must be retried, it is appropriate to make some brief comments on the vocational expert's projection of the earnings differential plaintiff would experience in the future as a result of his disability. The witness testified that in the free labor market, the plaintiff would make only $6,240 per annum, some $8,320 less than he would receive as a tool and diemaker.

This testimony, however, painted a distorted picture of plaintiff's future earning capacity, failing to give proper weight to the fact that plaintiff had completed his undergraduate work and expected to receive his master's degree within a few months. The evidence also ignored plaintiff's demonstrated intelligence, pleasing personality, industry, and wide interests. Moreover, the witness's observation that bachelor-degree holders with a history ma-

jor had difficulty finding jobs in recent years was not a convincing predicate for discounting the opportunities available to a person of plaintiff's talents. The expert's testimony disregarded Pennsylvania cases holding that in projecting probable future earnings, consideration must be given to such matters as age, condition, station in life, occupation, health, surroundings, education, and ability to perform in other markets in which plaintiff's skills could be utilized. *See Wolf v. C. Schmidt & Sons Brewing Co.*, 236 Pa. 240, 245, 84 A. 778, 779 (1912); *Lambert v. PBI Industries*, 244 Pa. Super. 118, 137–38, 366 A.2d 944, 954 (1976) (allocatur denied); *Havens v. Tonner, supra* at 377, 365 A.2d at 1273–74.

■ We recognize the distinction in Pennsylvania law between loss of earning capacity and loss of future earnings. Loss of earning capacity refers to the disadvantage a plaintiff suffers in competing with uninjured persons in the employment market. The impairment need not necessarily be reflected in a loss of earnings, and, indeed, there may be a recovery even if it can be shown that the plaintiff received higher earnings after an injury than before. *See Quinn v. Kumar*, 437 Pa. 268, 276, 263 A.2d 458, 462–63 (1970); *DeHaas v. Pennsylvania R.R.*, 261 Pa. 499, 503, 104 A. 733, 735 (1918). Thus, a portrait painter who suffered a crippling injury to his leg would be limited in his employment opportunities apart from painting, and could recover despite the fact that his commissions had increased after an accident.

■ Here, however, plaintiff did no more than attempt to project loss of earnings in the future. While that calculation may furnish some evidence of loss of earning capacity, the testimony must meet the requisite standards of proof and present an accurate and complete appraisal of the

---

4. There is some dispute whether defendant objected to the use of the 3% growth factor. Our reading of the record reveals that although the objections could have been more artfully phrased so as to be helpful to the trial judge, the defendant did object both during the direct examination of the expert, and also as plaintiff's counsel used the calculations in his closing to the jury. This was adequate to preserve the point for appeal.

plaintiff's capabilities as well as his impairments. Loss of future earnings in itself may not always accurately represent the extent of earning capacity impairment.

■ Finally, there is the question of what relief is appropriate. Specifically, the issue is whether we should grant a new trial limited simply to damages or one on all issues. In the federal courts the general rule was stated by the Supreme Court in *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931):

> "Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice."

The court of appeals has broad discretion to grant a new trial as to all or some issues. 6A Moore's Federal Practice § 59.06 (2d ed. 1974). In *Vizzini v. Ford Motor Co., supra* at 760–62, we noted the difficulty in concluding that there had been a complete separation of the damage and liability considerations in that personal injury case, and accordingly, decided upon an unlimited new trial. The same doubt that justice to both the parties would be served by a partial retrial persuades us that the better course would be to have this entire case submitted to a jury.

Accordingly, a new trial will be granted, and the case is remanded to the district court for that purpose.