**Mark David FIELD**

v.

**OMAHA STANDARD, INC.,** Savage **Truck Equipment Company and International Harvester Company.\***

**Civ. A. No. 81–2712.**

United States District Court, E.D. Pennsylvania.

June 23, 1983.

---

\* The only defendant which went to trial in this matter was International Harvester Company. Defendant Savage Truck Equipment Company was dismissed for lack of prosecution. Summary judgment was granted in favor of defendant Omaha Standard, Inc. on June 17, 1982.

Richard Angino, Harrisburg, Pa., for plaintiff.

George J. Lavin, Jr., Philadelphia, Pa., for Intern. Harvester Co.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

This is a products liability action which was instituted to recover damages for personal injuries sustained by plaintiff, Mark Field. Plaintiff's injuries arose from a collision on July 10, 1979, between the truck he was driving and an aerial crane truck which consisted, in part, of a cab-chassis manufactured and sold by defendant International Harvester Company ("IH"). Following a ten day jury trial, judgment was entered for defendant in accordance with the jury's finding that the IH cab-chassis was not defective at the time it left defendant's premises. Plaintiff now moves for judgment n.o.v. or in the alternative for a new trial. For the reasons which follow, plaintiff's motion will be denied.

## I. FACTS

The accident in question occurred on July 10, 1979, on Route 422 near Butler, Pennsylvania, while plaintiff was working for his employer, Tam Agri Corporation. Plaintiff was driving a 1979 Ford pickup truck towing a utility trailer, and was following a fellow employee driving a flatbed

aerial crane transporter. Both trucks were owned by Tam Agri. At some point the transporter stopped to make a left turn and plaintiff's pickup following immediately behind crashed into the transporter's back end. Because the hood of the pickup was lower than the body of the flatbed transporter, the pickup underrode the transporter, and the transporter's tail end crashed through plaintiff's windshield causing plaintiff serious bodily injuries.

Plaintiff brought the present products liability suit against IH claiming that the cab-chassis of the transporter was defectively designed and manufactured because it didn't have a rear underride guard to prevent an impacting vehicle from underriding the truck body in a rear end collision. The troublesome aspect of plaintiff's suit was whether the IH cab-chassis was rendered defective by its lack of an underride guard since it was the completed truck, rather than the component cab-chassis, which ultimately required the guard.

There was no dispute over the fact that the truck in question, in accordance with the standard truck manufacturing process, was manufactured in separate stages by independent parties. The first stage involved IH's delivery of the cab-chassis unit to an intermediate purchaser, in this case a dealer. Thereafter various parties, including a body builder specializing in building flat body trucks, took part in converting the cab-chassis into the completed truck. The cab-chassis by itself was nothing more than a component of the finished product. In fact, testimony adduced at trial revealed that cab-chassis units as a class may not be driven on the public highway until they are certified as having been finished by a body builder.

The cab-chassis at issue in the present case was what IH has denominated as an F1800 Model. This unit is a multi-purpose vehicle which can be utilized for any one of hundreds of various body configurations. It was ordered from defendant IH in 1971 by Troy, Inc., an authorized IH dealer. Troy wanted this cab-chassis for an aerial crane truck to be purchased by a customer

of Troy's, a building contractor named Ryland Systems. As was the usual practice, IH never knew the intended final configuration of the truck but merely filled Troy's order according to the specifications set out by Troy on IH's order forms. This could be done by IH without any knowledge of the final type of truck contemplated by the ultimate customer. Upon completion of the cab-chassis, IH delivered it to Troy which paid IH the accompanying invoice.

Troy arranged for completion of the truck to conform to its customer's needs by engaging several other parties. Thereafter the cab-chassis underwent the following changes: a crane was added; the rear wheels were moved back; the frame was lengthened as was the drive train; and a bed was added. When the work was finished the completed aerial crane truck was delivered by Troy to its customer, Ryland Systems. The truck then passed through the hands of several owners before being purchased by plaintiff's employer, Tam Agri.

The case was tried over a ten day period. Plaintiff's general theory was that IH should have provided an underride guard kit as a delete option to the order made by the original dealer for the cab-chassis. Plaintiff's expert opined that had this delete option been available, and if not deleted by the dealer, it would have been available to be attached to the crane transporter in question at some point along the assembly chain and plaintiff's injuries would have been avoided. However, another witness for plaintiff, the owner of the Troy dealership which had ordered the cab-chassis from IH and arranged for its completion by others, contradicted the expert. This witness stated that even if a guard had been offered as a delete option he would not have recommended its attachment because it would have interfered with the off-road use contemplated by the customer, in this case use relating to building construction.

The defendant offered evidence that the custom in the cab-chassis industry was for the manufacturer of the final stage to install an underride guard, if necessary.

This was because the cab-chassis, being a multi-purpose vehicle, was subject to so many varied additions, deletions and other changes that until all the changes were completed, it could not be determined whether an underride guard was even needed. Also, since only the final stage manufacturer is in a position to know the final size, shape and overall configuration of the truck, it is most practical for that party to consider and, if needed, to install any necessary guard. Defendant submitted evidence which showed that final stage manufacturers had the necessary expertise to provide adequate underride safety devices in 1971 when the truck at issue was completed.

Following the conclusion of the evidence, the jury returned a verdict for defendant and found that the IH cab-chassis was not defective when it was sold by IH to the dealer without an underride guard kit as a delete option. Plaintiff moved for judgment n.o.v. or for a new trial raising 28 separate grounds. Of these, 21 are not briefed, and are stated in merely general terms. In view of this, the Court has re-examined its previous rulings and is not persuaded that those rulings on these non-briefed points should be changed. Accordingly, it shall dismiss all non-briefed points of error for lack of prosecution in addition to lack of merit. *See* Local Rule 20(c); *Carl Walker & Associates, Inc. v. Dickerson Prestress, Inc.,* No. 75–2215, slip op. at 2 (E.D.Pa. Dec. 8, 1982). The remaining points are discussed below.

## II. DISCUSSION

### A. *Agency*

Plaintiff contends that the Court erred in ruling, as a matter of law, that defendant IH could not be held liable under principles of agency for the knowledge or conduct of its authorized dealer, Troy, Inc., with respect to the finished product. At the close of plaintiff's evidence pursuant to a Rule 50 motion of defendant, the Court concluded that plaintiff did not have a claim for liability under an agency theory. (Tr. 7–14). The Court's ruling was based on plaintiff's failure to prove that the scope of

the agency relationship between Troy and IH would allow the knowledge and conduct of Troy relating to conversion of the cab-chassis into a completed truck to be imputed to IH. As such, removal of the agency question from the province of the jury was not error and does not afford plaintiff grounds for relief.

It is well established in Pennsylvania that the knowledge of an agent can only be imputed to the principal in connection with any transaction conducted by the agent on behalf of the principal, when such knowledge is acquired in the course of the business in which the agent is employed. *Higgins v. Schenango Pottery Company,* 256 F.2d 504 (3d Cir.1958). Merely to state this principal, however, is to note its most obvious limitation. The knowledge in question must have been acquired by the agent while he was acting within the scope of the agency relationship as both he and the principal understood it. Thus for the purpose of the present case, the narrow question for resolution is whether Troy, Inc. was acting as IH's agent for the specific purpose of completing the unfinished product supplied by IH and delivering it into a stream of assembly and fabrication activity by different business houses that IH had no knowledge of nor affiliation with. It should be noted that the existence of an agency relationship between the parties for purposes of sale and delivery of the cab-chassis, the component part, is not determinative of the question and may even be immaterial. Merely because a party is an agent for some purposes does not mean that the party is an agent for all purposes. *Mellon Nat. Bank & Trust Co. v. Esler,* 357 Pa. 525, 55 A.2d 327 (1947).

It is beyond dispute that for a principal to be bound by the acts of his agent, those actions must fall within the actual or apparent scope of the agency. *See* Restatement of Agency (Second) § 216 comment a & § 228 and comments a, b, c & d (1958). The scope of the agency is to be determined in light of the agreement of the principal and the agent as well as all of the accompanying circumstances. In deciding

whether a particular undertaking by the agent was within the scope of the agency, one key factor is to consider if the service performed by the agent was one in which he was subject to control, or the right to control, by the principal. *See Scott v. Purcell,* 490 Pa. 109, 415 A.2d 56 (1980). If the facts concerning the connection between the parties are not in dispute, questions concerning the existence and the nature of the relationship are properly determined by the court. *Juarbe v. City of Philadelphia,* 288 Pa.Super. 330, 431 A.2d 1073 (1981).

■ Here, the relationship between Troy, Inc. and IH was governed by a written agreement. Plaintiff neither introduced this agreement nor questioned his witness, Chester Troy, as to its contents. Additionally, the evidence which was adduced failed to establish any question of fact on the issue of control of the cab-chassis as it evolved at the hands of other parties into a completed product. The evidence merely demonstrated a course of conduct by the parties whereby Troy, Inc., acting as an authorized sales representative of IH cab-chassis, would solicit orders for cab-chassis, complete them without any input from IH, forward them to IH, and thereafter expect and accept delivery of the cab and chassis as ordered. There was absolutely no evidence that IH had knowledge of or any involvement in the completion of the truck once the cab-chassis was delivered to Troy, Inc. Plaintiff, at page 17 of his brief, states:

> For the purpose of this argument, plaintiff also concedes that there is insufficient evidence of control by International over Troy, Inc.'s manner of selling finished trucks to establish a master-servant relationship.

Indeed, it is perfectly clear from the evidence that following delivery of the cab-chassis to the dealer, the dealer then became the agent of the customer in structuring the final stages of assembly and fabrication. The Court was thus correct in concluding as a matter of law that even if an agency relationship existed between Troy, Inc. and IH, the sale of completed trucks was not within the scope of the agency that brought forth only the sale of a cab and chassis.

Plaintiff also argues that the Court erred in determining as a matter of law that IH could not be held liable under the doctrine of apparent authority or agency by estoppel. In *Turnway Corporation v. Soffer,* 461 Pa. 447, 457, 336 A.2d 871, 876 (1975), the Pennsylvania Supreme Court summarized what was then and is still current law concerning this theory of agency.

> Agency by estoppel is defined by Section 8B. of the Restatement (Second) of Agency and the doctrine has been embraced by this Court in *Reifsnyder v. Dougherty,* 301 Pa. 328, 152 A. 98 (1930). Reifsnyder emphasized two basic elements of agency by estoppel: (1) there must be negligence on the part of the principal in failing to correct the belief of the third party concerning the agent; and (2) there must be justifiable reliance by the third party.... Agency by estoppel is generally deemed to be closely related to apparent authority. 2A C.J.S. Agency § 157 (1972). Thus, alternatively stated, a principal who clothes his agent with apparent authority is estopped to deny such authority. *Robertson Coal & Coke Co. v. Rothey,* 106 Pa.Super. 463, 162 A. 332 (1932); *Fay v. Deady,* 82 Pa.Super. 187 (1923).

■ Applying these principles to the present case it is clear that apparent authority has no application here. Crucially absent from the facts presented is any evidence which would suggest that plaintiff relied on an IH representation of Troy, Inc. as its agent when plaintiff did anything that resulted in the collision into the rear of the flatbed trailer in question. Without any form of proof that plaintiff actually did rely on an alleged agency between Troy, Inc. and IH, counsel's position that plaintiff could have so relied is not sufficient to carry the argument.

B. *Application of Verge v. Ford Motor Company—Admissibility of Evidence and Jury Instruction*

■ Plaintiff cites as error the Court's application of *Verge v. Ford Motor Co.,* 581

F.2d 384 (3d Cir.1978), to this case in allowing the admission of trade custom evidence and in instructing the jury that it should consider the *Verge* factors of practicality, expertise, and trade custom in determining the existence of a defect in the cab-chassis at the time it left defendant's possession. Plaintiff contends that *Verge* was interpreting Virgin Islands law and does not reflect Pennsylvania's view of products liability. Plaintiff's view lacks merit.

In *Verge*, a case factually similar to this one, plaintiff sued a cab-chassis manufacturer for its failure to install a backup buzzer on a vehicle later made into a garbage truck. The jury found that the absence of a warning device on the completed truck rendered it defective within the meaning of 402A and awarded plaintiff substantial damages. The cab-chassis manufacturer moved for judgment n.o.v., the denial of which was the basis of the appeal. In its discussion of the case, the Third Circuit stated that a design defect case of this type involves two primary issues: (1) was there a defect; (2) if so, who is responsible. On review, the Court found that there was substantial evidence to support the jury's finding, as to the first issue, that a defect existed. The Court then went on to consider whether "the responsibility for installing such a device should be placed solely upon the company that manufactured the cab and chassis, or solely upon the company who modified the chassis by adding the compactor unit or upon both." *Verge v. Ford Motor Co., supra,* 581 F.2d at 386. The court noted that in accordance with the language of 402A the issue could be rephrased in terms of whether the truck reached the consumer without substantial change or whether the truck was in a defective condition when it left the hands of the cab-chassis manufacturer. In making such a determination, three factors were delineated as crucial to the analysis:

1. Trade Custom—at what stage is the safety device generally installed;

2. Relative Expertise—which party is best acquainted with the design problems and safety techniques in question;

3. Practicality—at what stage is installation of the device most feasible.

*Id.,* 581 F.2d at 387.

Contrary to plaintiff's position here, there is nothing in the *Verge* opinion itself to indicate that the issue was being resolved in the context of Virgin Islands law. Instead, available evidence points to a different conclusion. The *Verge* court cited its own prior interpretation of Pennsylvania products liability law in *Taylor v. Paul O. Abbe, Inc.,* 516 F.2d 145 (3d Cir.1975) as the source of its holding. In *Taylor,* the Third Circuit examined Pennsylvania's interpretation of 402A liability in a situation where a manufacturer of a component part is sued for a design defect in the final product. Quoting from *Taylor* and without reference to Virgin Islands law, the *Verge* court concluded that where the final product is the result of substantial work by more than one party, the three factors set out above—custom, relative expertise, and practicality—must be weighed. Plaintiff's reliance on dicta in a footnote in *Holloway v. J.B. Systems, Ltd.,* 609 F.2d 1069, 1073 n. 11 (3d Cir.1979) to the effect that *Verge* was a matter of Virgin Islands law, is, of course, not dispositive. Then too, the numerous decisions of this district which have applied *Verge* in interpreting liability under the Pennsylvania law of 402A, persuade this Court that application of *Verge* to the present case was not error. *See Christner v. E.W. Bliss Co.,* 524 F.Supp. 1122 (M.D. Pa.1981) (plaintiff's motion in limine requesting reference to trade custom be ruled inadmissible denied in view of *Verge* and court's finding that product at issue was manufactured in stages); *Lesnefsky v. Fischer & Porter Co., Inc.,* 527 F.Supp. 951 (E.D.Pa.1981) (manufacturer of brewery control panel built to brewery's specifications granted summary judgment under *Verge*); *Powell v. E.W. Bliss,* 529 F.Supp. 48 (E.D.Pa.1981) (punch press sold as general purpose, multifunctional unit, unequipped with dies and having no point of operation found not to be a completed product—*Verge* standards applied); *Orion Ins. Co., Ltd. v. United Technologies Corp.,*

502 F.Supp. 173 (E.D.Pa.1980) (manufacturer of component in main rotor head assembly of a helicopter, manufactured to specifications of a third party with superior expertise in aviation, not liable for design defect—*Verge* applied). *See also Bradley v. James Campbell Smith, Inc.*, 91 F.R.D. 598 (E.D.Pa.1981) (*Verge* may be invoked if defendants' participation in the design and manufacture of a product is found to be limited).

It was and is this Court's conclusion that *Verge* was properly applied, and consequently plaintiff's claim that the Court erred both in limiting the evidence and in instructing the jury based on the three *Verge* factors cannot stand. Plaintiff, relying on *Heckman v. Federal Press Co.*, 587 F.2d 612 (3d Cir.1978), contended that the jury should have been able to consider six factors in determining the existence of a defect in defendant's component part. The six factors identified by the *Heckman* court included the following:

> 1) the feasibility of incorporating safety features during manufacture of the machine; 2) the likelihood that users will not secure adequate devices; 3) whether the machinery is of a standard make or built to the customer's specifications; 4) the relative expertise of manufacturer and customer; 5) the extent of risk to the user; and 6) the seriousness of injury which may be anticipated.

*Id.* at 617. *Heckman*, however, is inapposite since it involved a product which was in a finished state when it left defendant's hands. Indeed the *Heckman* court itself distinguished *Verge* as a case involving an unfinished product. *Heckman, supra*, 587 F.2d at 617.

■ Plaintiff also argues that he was improperly denied the opportunity to introduce evidence relevant to the balance between risk of injury and product utility. On this point, plaintiff states that although the Court allowed the defendant to introduce evidence that the underride docket of the National Highway Safety Bureau, a federal agency, was terminated because the agency considered rear underride not to be cost effective (Tr. 4–121), plaintiff was precluded from offering testimony that in fact rear underride was cost effective. When all of the circumstances are considered, it is plain that the Court's rulings were proper. Defendant's evidence was permitted only because plaintiff's expert based his opinion on the existence of study and inquiry by that agency. The jury was thus allowed to hear evidence of the government activity not because it provided a standard to be followed by the manufacturer, but rather as an aide in weighing the extent to which it should rely on the opinions of plaintiff's expert. (Tr. 4–121 to 4–123).

■ Plaintiff presents several challenges to the jury instructions, all of which may be disposed of summarily. Plaintiff contends that the Court erred in instructing the jury that if the jury determined that incorporation of a safety device would make the product less marketable or destroy its utility, then they could not find a defect. The Court further instructed that merely because certain products are dangerous does not in itself make them defective and used a sharp knife as an illustration. In addition, the jury was instructed according to *Verge* that it should consider trade custom, practicality, and expertise as relevant, but not dispositive, in determining on whom to place liability for a defect in a finished product manufactured in stages. Finally, plaintiff contends that the Court erred in failing to give adequate cautionary instructions as to the effect of the trade custom and government regulations evidence on the issue of a defect. These claims of error in the charge must be rejected. Plaintiff did not voice these particular objections at trial and absent plain error, cannot now raise them by post-trial motion. (*See* Tr. 10–112 to 10–113, at which the Court called a side-bar immediately after completing the jury charge and expressly invited counsel's objections thereto). Fed.R.Civ.P. 51; *McCarthy v. Silver Bulk Shipping Ltd.*, 487 F.Supp. 1021, 1032 (E.D.Pa.1980). The challenged instructions cannot reasonably be considered

as amounting to "plain error" warranting plaintiff a new trial because the alleged errors are neither obvious nor substantial nor require judicial correction to prevent a clear miscarriage of justice. *See Wirtz v. International Harvester Co.,* 331 F.2d 462, 465 (5th Cir.1964), *cert. den.,* 379 U.S. 845, 85 S.Ct. 36, 13 L.Ed.2d 50. Finally, the Court's instructions were not only proper in view of the legal principles of *Verge* set forth earlier, they were fair and adequate when considered as a whole.

## C. *Admission of Evidence that Plaintiff's Brakes were Disconnected*

Plaintiff posits as error the admission of certain evidence which plaintiff contends suggested that he was negligent. Plaintiff argues that in a "second collision" case, the evidence must be limited to the nature of the product, and cannot include the conduct of the parties. While the Court doesn't fully understand the principle involved in this case as phrased by plaintiff in the "second collision" context, the Court does agree that plaintiff's conduct would not shield defendant from liability under 402A if liability would otherwise exist. *Holloway v. J.B. Systems, Ltd.,* 609 F.2d 1069 (3d Cir.1979). In any event, the conduct evidence in question was properly admitted on the issue of proximate cause. Since the rulings may be sustained on this ground alone, the Court declines to decide whether assumption of the risk was properly at issue in the case.

As stated above, the Court has difficulty with plaintiff's conclusion that the present case should be characterized as one involving enhancement of injuries due to a second collision. As stated by the Third Circuit in *Huddell v. Levin,* 537 F.2d 726, 738 (3d Cir.1976), the essence of the manufacturer's liability in a second collision case is the enhancement of the injuries. As further delineated in *Jeng v. Witters,* 452 F.Supp. 1349, 1355 (M.D.Pa.1978), *aff'd* 591 F.2d 1335 (3d Cir.1979):

> The term "second collision", as used in definitions of crashworthiness of a motor vehicle in products liability cases general-ly refers to the collision of the passenger with the interior part of the automobile *after the initial impact or collision....* The principle behind the "second collision" concept is that because of the way the vehicle has been manufactured a passenger's injuries *have been aggravated unnecessarily,* and such a concept has equal applicability whether the person's second collision is with the interior of the vehicle or as in this case, the highway.

(Emphasis supplied). Here, plaintiff's injuries were not enhanced by a second impact because the only collision which occurred was between the occupant compartment of plaintiff's pickup where plaintiff was sitting and the rear of the flatbed truck which penetrated into the passenger area. Thus plaintiff's claim that the jury should not have considered the facts of the *initial* accident because liability was predicated on a second impact, is based on a confused and misleading factual premise. No matter what label appeals to plaintiff to describe the tragic event, the question of proximate cause was a proper issue in this as in most 402A cases.

Even though it is true that plaintiff was proceeding solely under a 402A strict liability theory which would preclude admitting testimony relating to his lack of due care for the *purpose* of barring or limiting recovery, it is equally true that such evidence, properly limited, is admissible for the jury's consideration on the issue of proximate cause. In determining proximate cause the jury had to decide how the accident occurred and what factors were involved. On the one hand was plaintiff's theory that the impact which brought about plaintiff's injuries was caused by the transporter truck's failure to have a rear underride guard. It was made clear in the evidence that even properly installed underride guards have a certain limit to their tolerance for resisting impacts at various speeds and other elements that make up the dynamics of rear end collisions. It was the defendant's theory that the impact resulting in injury was not caused by the absence of a rear guard. Instead it was caused by disconnection of the brakes on a

heavy utility trailer plaintiff was towing and the resultant effect on the pickup's ability to stop, or more importantly, to slow to a speed that would have allowed an underride guard to have prevented the injury suffered by the plaintiff. It was for the jury to resolve the question of whether the lack of an underride guard was a substantial factor in bringing about plaintiff's accident. The testimony concerning disconnection of the trailer brakes was both relevant and admissible to aid the jury in making their determination. Additionally, references in plaintiff's evidence to speeds, weights, direction and the usefulness of guards made defense evidence of the speed, weight and direction of plaintiff's pickup and trailer clearly admissible.

▆▆ Furthermore, the Court was very careful to instruct the jury that the testimony relating to plaintiff's conduct should be disregarded *except* to the extent it shed light on whether the lack of a guard brought about the accident. (Tr. 10–98). This instruction comported with the law, and was not objected to by plaintiff. The Court sees no merit in plaintiff's claim of error due to admission of the conduct testimony. In any event, any error the Court may have committed concerning this issue would be harmless error under Rule 61 of the Federal Rules of Civil Procedure since the jury found that defendant's product was not defective and it did not have to decide the question of proximate cause in its deliberations. Thus plaintiff is not entitled to a new trial on this ground.

### D. *Refusal of Plaintiff's Expert Testimony in Rebuttal*

▆▆ Plaintiff argues that the Court unreasonably prejudiced his case in refusing to delay the trial to allow him to call his expert, Dr. Batterman, in rebuttal. Due to a reasonable belief that defendant's evidence would take longer than it actually did, the particular witness was unavailable on the day defendant completed its case. However, even assuming Dr. Batterman had been present, the Court's ruling that the rebuttal would not be allowed would

have been the same. Although the Court expressed concern about the administration of the case, the basis of its decision was the inadequacy of plaintiff's offer of proof. After hearing argument at side-bar, the Court concluded, *and plaintiff agreed*, that the substance of the evidence proffered had already been presented in plaintiff's case in chief by a different expert, Mr. Slagle. (Tr. 9–126). As such the evidence was excludable in the Court's discretion as unnecessarily cumulative. *Bowman v. General Motors Corp.*, 427 F.Supp. 234 (E.D.Pa.1977). Since plaintiff was not seeking to rebut the defense's presentation of an alternative theory or new facts, the Court cannot be said to have abused its discretion. *See Frankel v. Styer*, 386 F.2d 151 (3d Cir.1967); *Olsen v. United States*, 521 F.Supp. 59 (E.D.Pa.1981). Furthermore, if it can be said that there was error, it would be harmless error because the testimony sought to be introduced related solely to the issue of proximate cause, an issue which the jury did not have to decide due to its conclusion that the defendant's cab-chassis was not defective at the time it left defendant's hands. Fed.R.Civ.P. 61.

### E. *Refusal to Permit Plaintiff's Motion Picture on Underride into Evidence*

Plaintiff contends that the Court erred in refusing to admit into evidence a film produced by the Insurance Institute for Highway Safety. At trial plaintiff offered the film to prove that certain underride guards being installed by truck body builders were inadequate and thus useless. (Tr. 2–165). Plaintiff also felt it would be helpful for the jury to visualize what the rear underride problem entailed. (Tr. 2–168). The film, entitled "Underride," showed in graphic detail the gruesome consequences of an accident involving underride. In motion slow enough to be clearly visualized, the film depicted the impact on the passenger compartment and its human cargo as a car rides under the higher truck frame in a rear end collision. The film showed both the manner and the type of injury suffered

as a result of inadequate underride protection. Still photographs of various accident scenes are disclosed, one with blood covering the driver's seat, another with deceased driver's head shoved back at an unnatural angle towards the rear of the car. Slow motion segments taken from inside a car carrying two dummy passengers reveal the horrible results of a collision into the tail end of an unguarded tractor-trailer as the bed of the truck is violently shoved into the heads of the dummies.

Extensive discussion was held between counsel and the Court, both on and off the record, as to the film's admissibility. (Tr. 2–165 to 2–177; 3–2 to 3–6). After careful consideration during the course of the trial the Court concluded that the film should be ruled inadmissible as unduly prejudicial. Fed.R.Evid. 403. *See Thomas v. C.G. Tate Construction Co., Inc.,* 465 F.Supp. 566 (D.C.S.C.1979) (granting motion in limine). Not only was the film gory and inflammatory, it also had the implicit tendency to confuse the jury as to the real issue of the case. The question was not whether a finished truck lacking an underride guard presented a potentially hazardous condition, but rather, whether defendant's product, a cab-chassis concededly in substantially unfinished condition when sold, was defective when it left defendant's possession. Additionally, plaintiff's claim that the jury could not understand underride without seeing this film is neither persuasive nor a realistic appreciation of the level of comprehension enjoyed by persons called and accepted for jury service generally in our courts and particularly in this case. Numerous witnesses described the underride effect. Testimony over most of the ten days, diagrams, models, pictures, and hand gestures, in addition to an underride guard testing film, were all used to explain the phenomenon. Clearly it cannot be said that the film "Underride" was necessary for the jury to perceive the physical principles of underride.

Viewing the transcript objectively the Court is firmly convinced that its original ruling was correct. The arguments presented by plaintiff in his brief on this particular evidentiary question present nothing new or different from that which was previously argued and rejected at trial. The Court thus sees no reason to grant plaintiff a new trial on this ground.

F. *Expert's Report Not Allowed to be Read Either During Cross Examination or During Plaintiff's Closing*

Plaintiff asserts that the Court abused its discretion in giving him contradictory instructions and thereby precluding him from reading excerpts of a statement by the Director of the Insurance Institute for Highway Safety, William Haddon. This claim is incorrect inasmuch as the instructions given were not contradictory, but only interpreted as such by plaintiff.

The report in question concerned a demonstration study by the Institute which intended to show that in certain cases, lightweight guards could be produced which had a measure of effectiveness against rear underride. The issue of allowing the report to be read to the jury first arose in the context of plaintiff's cross examination of defendant's expert, Dr. Moffat. During a jury recess used to discuss the scope of plaintiff's cross, the Court set out general guidelines for the use of documents in cross examination. (Tr. 9–31 to 9–34). The Court stated that within the limits of admissibility, statements could be read by counsel for the purpose of eliciting the witness's opinion thereon.

While cross examining Dr. Moffat, plaintiff attempted to read a portion of the study written by Mr. Haddon and dated March 16, 1977, which set out the parameters of the Institute's undertaking. The Court interrupted counsel to discern the purpose of the reading, noting that the statement was written in 1977 whereas the vehicle which was involved in plaintiff's accident was sold six years before, in 1971. The following colloqy ensued:

MR. ANGINO: The purpose of the question was—and I will rephrase it—

THE COURT: Just ask your question rather than read because we kind of get lost in what you are doing, whether it is a predicate for a question, whether it is a question, or whatever. I won't just allow *general reading* by an attorney to a witness.

If you want to read to the jury, you can use your closing speech time for that. You can divide that time any way you want.

(Tr. 9–60) (emphasis added).

■ The above instruction, combined with what was said during the recess, makes clear the Court's position that counsel may not simply read statements during cross examination unless they are directly related to a question. After receiving the Court's ruling, however, plaintiff decided to take a different tack in his subsequent examination rather than pursue the contents of Mr. Haddon's study. Apparently plaintiff erroneously assumed from the Court's comment that his right to read Mr. Haddon's statement during closing argument had been automatically preserved. Such an assumption was unwarranted and any error which resulted should not be cast upon the Court. Surely, a counsel with the trial experience of plaintiff's counsel here doesn't have to have the Court explain, chapter and verse, that the right to read *anything* to a jury in summation requires that it be in evidence, a status that the Haddon report never enjoyed. (Tr. 10–4). At best, the episode represents an unfortunate misinterpretation by plaintiff. The Court intended to convey that unless they could be viewed as a predicate for a question, the appropriate time for counsel's reading of lengthy documents was during summation. Since it was not clear that the reading which was attempted was in fact a prelude to a question, the Court in its discretion properly refused to allow that particular reading.

Plaintiff's confusion surfaced prior to the closings when defendant objected to the contemplated use of Mr. Haddon's report in plaintiff's argument. Plaintiff responded that the Court had previously indicated to him that he would be allowed to read the report at this time. Relying on the fundamental principle that a statement which was neither admitted into evidence nor addressed during direct testimony cannot be utilized during closing argument, the Court ruled in defendant's favor. *Draper v. Airco, Inc.*, 580 F.2d 91, 96 (3d Cir.1978). As explained above, the ruling did not contradict the instructions given during cross examination and thus does not provide plaintiff with grounds for a new trial.

■ Assuming arguendo that the instructions did have a tendency to confuse resulting in error, the error engendered thereby was harmless. The report that plaintiff wished to read discussed the technical feasibility of developing a prototype guard. Even aside from the question of the report's relevancy in view of its post-accident date, it should be noted that the topic of the feasibility of designing an underride guard was not disputed by defendant and therefore was not a key issue in the case. The central question for determination was whether defendant's cab-chassis was defective when it left defendant's hands because *some type* of guard kit was not provided. Since the jury answered this question in the negative, its failure to learn the Institute's view on what type of guard could have been provided was immaterial.

G. *Court Participation in the Trial*

Plaintiff's final allegation of error is that the Court exceeded its discretion in monitoring the trial by cross examining plaintiff's witnesses and excluding testimony without objection from defense counsel. Plaintiff asserts that the excessive disruption prejudiced his case. Despite the numerous citations to the record, this claim is wholly devoid of support. Most of the citations concerned instances where the court asked questions in order to clear up ambiguities in the testimony or direct the witness's attention to the specific issues in the case. Other citations refer to instances where the Court made a brief comment, or rephrased counsel's question to prevent leading or to keep the testimony focused on

matters that were relevant. On one occasion the Court precluded certain testimony as irrelevant despite defendant's statement that he did not object. (Tr. 4–5 to 4–6).

In *Garrett v. Faust,* 9 F.R.D. 482 (E.D. Pa.1949), *vacated on other grounds,* 183 F.2d 625, *cert. den.,* 340 U.S. 931, 71 S.Ct. 493, 95 L.Ed. 672, *rehearing denied,* 341 U.S. 917, 71 S.Ct. 733, 95 L.Ed. 1352, *rehearing denied,* 341 U.S. 933, 71 S.Ct. 801, 95 L.Ed. 1362, defendants made a similar complaint to that voiced by plaintiff in this case. In particular, the *Garrett* defendants objected to the Court's examination of the plaintiff. In denying this claim a ground for error the proper rule was admirably stated as follows:

> Where a trial threatens to bog down in a morass of confusion, it is not only the right but the duty of a trial judge to lend his assistance in an attempt to preserve an orderly procedure.

*Garrett v. Faust, supra,* 9 F.R.D. at 486.

■ Here, as in *Garrett,* only this duty to preserve orderly development of the facts was exercised by the Court. In so doing, there was no abuse of judicial discretion entitling plaintiff to a new trial. After reviewing the record the Court has concluded that all its remarks were balanced and accurate and that plaintiff's claim of prejudice must be denied.

## III.  CONCLUSION

Upon consideration of all of plaintiff's arguments in support of his motion for judgment n.o.v. or for a new trial, the motion is denied.

An appropriate Order will be entered.