HAMMOND, Ruth L., Administratrix of the Estate of James B. Hammond, Sr., and Ruth L. Hammond, in her own right

v.

INTERNATIONAL HARVESTER CO., Appellant.

No. 81–2720.

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1982.

Decided Oct. 26, 1982.

Rehearing and Rehearing In Banc Denied Nov. 19, 1982.

William V. Coleman, Thomas J. Finarelli, Liebert, Short, Fitzpatrick & Lavin, Philadelphia, Pa., for appellant.

Edward F. Silva, Feinberg & Silva, Philadelphia, Pa., for appellee.

Before SEITZ, Chief Judge, and GARTH and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case presents a narrow question for review: where a knowledgeable purchaser of farm equipment instructs the manufacturer of that equipment prior to delivery to remove a safety device incorporated as a standard feature in its product design, and an experienced employee of the purchaser who operates the equipment loses his life in an accident which probably would not have occurred if the standard safety device had been in place, may the manufacturer be held liable for the employee's death under Pennsylvania products liability law?

Plaintiff, as administratrix of the decedent's estate and in her individual capacity, instituted this diversity action[1] in the United States District Court for the Eastern District of Pennsylvania, and the case was tried to a jury. The jury returned a verdict in favor of the plaintiff on the issue of liability, the parties having previously agreed to an amount for damages. The defendant, International Harvester Co. (manufacturer), appealed. We affirm.

### I.

The events giving rise to this diversity action occurred on a Tyrone, Pennsylvania, dairy farm owned by Lois Peck and managed by John Newlin. James Hammond, Sr. (Hammond), a tenant farmer and employee of Ms. Peck, lived on the farm with his teenage son, Ronald Hammond (Ron), and his wife Ruth L. Hammond, the plaintiff in this case.

Newlin, the farm manager, was responsible for ordering equipment for the farm. In the time that he managed the Peck farm he purchased two skid loader tractors (tractors or skid loaders) for use primarily in moving manure. Newlin purchased the second tractor in 1976. It was an International Harvester Front End Skid Loader—Series 3300.[2] That model comes equipped with a roll over protective structure and side screens (ROPS), which prevent the driver from leaning or falling out of the operator's seat area. Newlin requested the dealer to remove the ROPS from the farm's second tractor prior to delivery. Newlin, who died before trial, wanted the ROPS removed apparently because the tractor would have difficulty moving through a low barn door with the ROPS attached.

Jim Hammond operated the second tractor for approximately eight months without mishap. Then, on April 18, 1977, the fatal accident occurred. Hammond and his son Ron were attempting to put a metal leg stand under a manure conveyor. Hammond drove the tractor up to a hill where the manure conveyor was resting, and picked up the conveyor with the bucket of the loader so that Ron could put the support legs under the conveyor. As Ron was attempting to get the legs under the conveyor, his father stood up on the knee guard of the tractor, apparently to get a better view. As Hammond stood on the knee guard, he evidently slipped and in his fall, inadvertently released the boom arm by striking the foot pedal. The boom arm descended suddenly, crushing his upper torso which was then extended over the side of the tractor. Hammond died pinned beneath the boom arm.

The manufacturer concedes that this fatal accident would not have occurred had

1. The parties and the district court proceeded on the assumption that Pennsylvania law governs. The plaintiff is a resident of Pennsylvania. The defendant is a Delaware corporation doing business in Pennsylvania. The accident giving rise to this suit occurred in Pennsylvania. We also apply Pennsylvania law.

2. A 3300 Series B skid loader is a four-wheel drive compact loader tractor operated by a (4 cylinder) gasoline engine. The loader bucket is attached to the front end and may be raised or lowered by the operator by maneuvering the boom control pedals. The boom extends parallel to the operator's seat from the rear of the tractor to the bucket at the front and, according to the manufacturer's manual, is elevated or lowered by the boom control pedals which control the hydraulic system of the boom and bucket on the loader. The foot control pedals permit the operation of the boom and bucket simultaneously while driving with the forward and reverse control levers, and the speed with which the boom moves depends upon the movement of the foot control pedals.

the tractor been equipped with a ROPS. The jury could have inferred that had a ROPS been attached, its side screens would have broken Hammond's fall and kept him within the safety zone of the operator's seat. Thus, his body would not have extended over the side of the tractor and would not have been crushed by the boom arm.

The plaintiff brought this action on a products liability theory. She claimed that the Series 3300 loader tractor delivered to the Peck farm was defective in design because, *inter alia,* it lacked a ROPS and screens.

## II.

The history of Pennsylvania's modern law of products liability begins with *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966). In that case, the Pennsylvania Supreme Court adopted section 402A of the Restatement of Torts Second. That section reads in pertinent part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if ... (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Two years after its adoption of section 402A in *Webb,* the Pennsylvania Supreme Court held that "lack of proper safety devices can constitute a defective design for which there may be recovery." *Bartkewich v. Billinger,* 432 Pa. 351, 354, 247 A.2d 603, 605 (1968). The *Bartkewich* rule has been followed repeatedly by federal courts applying Pennsylvania law in diversity. *See Heckman v. Federal Press Co.,* 587 F.2d 612 (3d Cir. 1978); *Schell v. AMF, Inc.,* 567 F.2d 1259 (3d Cir. 1977).

In the course of the 1970's, a trilogy of Pennsylvania Supreme Court cases further developed the law of products liability in that state. In the first of these cases, *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 319 A.2d 903 (1974), the Pennsylvania

Supreme Court permitted an employee, who was injured when a defective steam boiler purchased by his employer exploded, to proceed against the manufacturer of the boiler. *Salvador* abolished Pennsylvania's horizontal privity requirement which had prevented ultimate consumers injured by a defective product from recovering against a manufacturer with whom they had no contractual relationship. The *Salvador* court explained its decision to do away with the horizontal privity requirement thus:

Today, as the Superior Court correctly recognized, a manufacturer by virtue of section 402A is effectively the guarantor of his products' safety. See *Webb v. Zern,* supra; *Kassab v. Central Soya,* [432 Pa. 217, 246 A.2d 848]. Our courts have determined that a manufacturer by marketing and advertising his product impliedly represents that it is safe for its intended use. We have decided that no current societal interest is served by permitting the manufacturer to place a defective article in the stream of commerce and then to avoid responsibility for damages caused by the defect. He may not preclude an injured plaintiff's recovery by forcing him to prove negligence in the manufacturing process. *Webb v. Zern.* Neither may the manufacturer defeat [a breach of warranty] claim by arguing that the purchaser has no contractual relation to him. *Kassab v. Central Soya.* Why then should the mere fact that the injured party [in a products liability action] is not himself the purchaser deny recovery?

457 Pa. at 32, 319 A.2d at 907.

*Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975), a plurality opinion of the Pennsylvania Supreme Court, followed one year after *Salvador.* While *Salvador* addressed the question of who might sue the manufacturer of a defective product, *Berkebile* examined the concept of defectiveness itself. *Berkebile* defined defectiveness broadly. "A 'defective condition,'" the court held, "is not limited to defects in design or manufacture. The seller must provide with the product every

element necessary to make it safe for use." *Id.* at 100, 337 A.2d at 902. Furthermore, defectiveness denotes an objectively definable condition inherent in the product itself, and has nothing to do with the manufacturer's negligence. "The seller," the *Berkebile* court opined, "is responsible for injury caused by his defective product even if he 'has exercised all possible care in the preparation and sale of his product.'" *Id.* at 94, 337 A.2d at 899 (quoting Restatement (Second) of Torts § 402A–(2)(a)).

■ *Berkebile* rejects any suggestion that the use of the phrase "unreasonably dangerous" in the text of Restatement § 402A brings issues of fault and negligence back into Pennsylvania products liability law. The court explains that the words "unreasonably dangerous" appear in the text only to ensure that liability is limited to defective products, so that manufacturers of innately dangerous products such as whiskey and knives are not "'automatically [held] responsible for all the harm that such things do in the world.'" 462 Pa. at 95, 337 A.2d at 899 (quoting Prosser, *Strict Liability to the Consumer in California,* 18 Hast. L.J. 9, 23 (1966)).

■ The 1978 case of *Azzarello v. Black Brothers Co.,* 480 Pa. 547, 391 A.2d 1020, completes the Pennsylvania trilogy. *Azzarello,* a unanimous opinion of the Pennsylvania Supreme Court, clarifies the plurality opinion in *Berkebile.* The phrase "unreasonably dangerous" used in Restatement § 402A, the court explains, is not utterly without meaning. Although the phrase has "no independent significance," it does "represent a label to be used where it is determined that the risk of loss should be placed upon the supplier." 480 Pa. at 556, 391 A.2d at 1025. This issue of whether the risk of loss should be placed on the supplier is a question of law for the court to decide with an

eye toward the "social policy" underlying Pennsylvania products liability law. *Id.* at 558, 391 A.2d at 1026. The trial court must exercise its own judgment in determining whether the facts alleged by plaintiff, if true, would justify imposition of strict liability. Only after the court answers this question in the affirmative may it turn the case over to the jury for a determination as to whether the facts alleged are true. *Id.*[3]

*Azzarello* concludes by reemphasizing the high standards to which manufacturers are held under Pennsylvania law:

> For the term guarantor to have any meaning . . . the supplier must at least provide a product which is designed to make it safe for its intended use. Under this standard, in this type of case, the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use.

480 Pa. at 559, 391 A.2d at 1027.

### III.

Applying the legal framework set out in the Pennsylvania products liability trilogy to the case at bar, we see no reason to upset the verdict for plaintiff. As the defendant itself recognizes in its brief to this court, "[B]y denying [International Harvester Company's] motions for [a] directed verdict, Judge VanArtsdalen in effect ruled that [under the facts alleged] the loader was unreasonably dangerous." Judge VanArtsdalen then properly submitted the case to the jury to determine if the facts alleged were true. Responding to special interrogatories, the jury replied in the affirmative and found that the tractor was in a defective condition at the time of the sale and delivery.[4]

---

**3.** *See also Vargus v. Pitman Manufacturing Co.,* 675 F.2d 73 (3d Cir. 1982); *Baker v. Outboard Marine Corp.,* 595 F.2d 176 (3d Cir. 1979) (explaining *Berkebile* and *Azzarello* ).

**4.** Both at trial and before this court, defendant took exception to the trial judge's jury charge on the issue of defective design. The judge,

however, did charge in accordance with *Azzarello.* The defendant's argument on this point amounts in essence to an assertion that *Azzarello* was wrongly decided. We, as a federal court sitting in diversity, are not free to second guess the wisdom of Pennsylvania Supreme Court policies in deciding issues of Pennsylvania law.

■ We do not believe Judge VanArtsdalen erred in holding as a matter of law that the facts alleged by plaintiff would support a finding that the loader tractor involved in the accident was unreasonably dangerous. Mrs. Hammond alleged, and indeed, defendant conceded, that International Harvester delivered a loader tractor lacking a ROPS. If a ROPS is an "element necessary to make [a skid loader] safe for use," then any skid loader lacking a ROPS is defective under the holdings of *Azzarello* and *Berkebile.*

We are persuaded that a ROPS is an element necessary to make a skid loader safe for use. The very existence of a safety device which was produced by the manufacturer, and which would probably protect the operator from serious injuries, is itself strong evidence that a tractor lacking such a device is not equipped with every element necessary to make it safe for use. Furthermore, the ROPS is standard equipment on the International Harvester Series 3300 loader tractor. This reflects the manufacturer's judgment that a skid loader with a ROPS will not be unduly expensive or inconvenient to use, and that for safety's sake a loader tractor should come equipped with a ROPS. Without a ROPS, a loader tractor falls short of the optimal design; its design is legally defective and the defect is not cured because the removal of the safety device is specifically requested by the purchaser.

The importance of the ROPS feature is further illustrated by Occupational Safety and Health Administration (OSHA) regulations promulgated in March of 1976, some months prior to the date on which the Peck Farm purchased its Series 3300 skid loader. These regulations (29 C.F.R. § 1928.51) deal with the precise problem presented in this case: a piece of agricultural equipment that is safer when equipped with a ROPS, but will not fit inside a farm building with the ROPS attached. The regulations resolve the difficulty by requiring that every tractor, including tractors used inside farm buildings ("low-profile" tractors), come equipped with a ROPS. The ROPS may be removed when the tractor is being used inside any farm building with "insufficient vertical clearance to allow a ROPS equipped tractor to operate." The ROPS may also be left off while the tractor is in use "incidental to" work performed in a low building. At all other times the ROPS must be attached. Under OSHA's scheme a ROPS would have been attached to the loader tractor at the time of Hammond's accident, and the accident would have been prevented.

■ We recognize that these OSHA regulations do not directly govern the instant case because the tractor in question was manufactured at least six months prior to the effective date of the regulations.[5] Nevertheless, OSHA's very decision to promulgate these regulations provides strong support for the proposition that a loader tractor—even one which must frequently pass through a low door—does not possess every element necessary to make it safe for use unless it comes equipped with a ROPS.[6]

**5.** Defendant might further contend that the OSHA regulations do not govern the case insofar as they require only a roll over protective structure and do not refer to side screen attachments. We would reject such a contention as, in the instant case, the removal of the ROPS feature was the cause in fact of Hammond's death. On the International Harvester Series 3300 loader tractor, the roll over protective structure and side screens are assembled as a single unit and attached to the tractor as standard equipment. In this case they were detached as a unit at the request of the purchaser because the tractor would not go through a low barn door with the roll over protective structure attached, and the side screens could not stand on their own without the roll over protective structure. Had the manufacturer complied with now current OSHA regulations by providing a roll over protective structure with the Peck farm tractor, it would have provided the standard roll over protective structure incorporating side screens. These side screens, the jury reasonably believed, could have prevented Hammond from falling under the boom arm, and thus saved his life.

**6.** *Bowman v. General Motors,* 427 F.Supp. 234 (E.D.Pa.1977), *Dreisonstok v. Volkswagenwerk, A.G.,* 489 F.2d 1066 (4th Cir. 1974), and *Biss v. Tenneco, Inc.,* 64 A.D.2d 204, 409 N.Y.S.2d 874 (1978), *mot. for lv. to app. den.,* 46 N.Y.2d 711,

The jury having found that the Series 3300 skid loader delivered to the Peck farm in the spring of 1976 was defective because it lacked a ROPS, then as a matter of law International Harvester is strictly liable for the consequences of this defect. Whether the International Harvester salesman acted reasonably or prudently in accepting an order for a tractor without the ROPS is irrelevant in this case; under Pennsylvania law a product's defectiveness has nothing to do with such negligence concepts as manufacturer's care or prudence. Defectiveness is solely a function of the condition in which the product is delivered to the consumer, *see Berkebile, supra; Azzarello, supra; accord, Holloway v. J.B. Systems, Inc.,* 609 F.2d 1069 (3d Cir. 1979), and this skid loader was delivered without a ROPS.

Decedent Hammond's exercise of prudence or care is similarly irrelevant under the facts of this case; he did not himself request that the skid loader be delivered with its ROPS removed. Indeed, there is no evidence that he had any influence whatsoever over the condition in which the loader tractor was delivered. Any risk which farm owner Lois Peck and manager John Newlin may have assumed by ordering a tractor without a ROPS cannot be imputed to their innocent employee.[7]

The defendant's reliance upon *Taylor v. Abbe,* 516 F.2d 145 (3d Cir. 1975), a diversity case interpreting the law of Pennsylvania, is misplaced. In that case, a manufacturing concern, Superior Zinc Company, contacted defendant parts supplier to order a new cylinder and drum for a pebble mill. The pebble mill was originally manufactured in 1909 by a company not party to the *Taylor* lawsuit. The parts supplier shipped Superior Zinc the parts requested as well as several other parts required for the repair. Defendant also offered to ship Superior Zinc a safety guard for the parts at some additional cost, but Superior Zinc refused this offer. Subsequently, an employee, Taylor, mangled his hand in the unguarded machinery. Taylor proceeded against the parts supplier on the theory that the supplier was responsible for the unreasonably dangerous condition of the machinery. A jury found for Taylor.

This court reversed and ordered the trial court to enter judgment for the defendant notwithstanding the verdict. We reasoned that defendant parts supplier was not responsible for any defect in the pebble mill machinery because it had neither designed nor manufactured the pebble mill. Indeed, it had not even assembled the parts which it sent to Superior Zinc.

The instant case plainly is not governed by *Taylor.* International Harvester both designed and manufactured the defective loader tractor in this case. Thus, it is wholly responsible for the condition in which the tractor was delivered.

## IV.

Finally, International Harvester contends that we must set aside the verdict for plain-

---

416 N.Y.S.2d 1025, 389 N.E.2d 841 (N.Y.1978), cited by the defendant are all inapposite. *Bowman* and *Dreisonstok* address themselves to situations in which a manufacturer has consciously balanced considerations of safety, convenience, and cost and has settled upon a design which is not optimally safe. *Biss* concerns a situation in which the manufacturer has declined the balancing task and left the decision of whether to purchase optional safety devices to the consumer.

In the instant case, by contrast, the manufacturer balanced considerations of safety, convenience, and cost, and opted for a skid loader design that maximized safety by including the ROPS as standard operating equipment. Yet, at the purchaser's request, the manufacturer delivered the skid loader without a ROPS. This situation is wholly different from the situations presented in *Bowman, Dreisonstok,* and *Biss.* As *Bowman, Dreisonstok,* and *Biss* are not on point, we need not consider whether they are consistent with contemporary Pennsylvania products liability law.

7. We do not reach the question of whether the outcome in this case would have been different had decedent Hammond personally requested that the skid loader be delivered without a ROPS. Similarly, we do not reach the issue of whether Hammond might have assumed the risk of death by voluntarily operating a skid loader without a ROPS. Appellant International Harvester did not raise this issue on appeal and we therefore will not consider it.

tiff because one Walter Pruyn, who was called to testify as an expert witness in this case, was not a qualified expert under Fed. R.Evid. 702. We disagree.

Mr. Pruyn had worked selling automotive and mechanical equipment including agricultural equipment. He had also taught automobile repair and maintenance at a high school. The defendant makes much of Pruyn's lack of formal education, complaining that Pruyn has no degree in either engineering or physics. Yet under Rule 702, an individual need possess no special academic credentials to serve as an expert witness. The rule provides in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as expert by knowledge, skill, experience, training or education may testify thereto ....

Mr. Pruyn would appear to be qualified as an expert by knowledge and experience. As stated in *Moran v. Ford Motor Co.,* 476 F.2d 289, 291 (8th Cir. 1973), "[P]ractical experience as well as academic training and credentials may be the basis of qualification [as an expert witness]."

Qualification of experts is peculiarly within the discretion of the trial court and its rulings are reversible only for abuse of discretion. *Moran v. Ford Motor Co., supra,* 476 F.2d at 291. We cannot say that the district judge abused his discretion by admitting Pruyn's expert testimony.

## V.

In conclusion, we find no reversible error in the district court. The judgment of the district court will be affirmed.