**IN RE: CATALYST LITIGATION**
**JOHN BULLY, Plaintiff**
v.
**HESS OIL VIRGIN ISLANDS CORP., et al., Defendants**
**ALEXANDER EMILE, Plaintiff**
v.
**HESS OIL VIRGIN ISLANDS CORP., et al., Defendants**
**JULIEN McSWEEN, Plaintiff**
v.
**HESS OIL VIRGIN ISLANDS CORP., et al., Defendants**
**RICHARD MAXWELL, Plaintiff**
v.
**HESS OIL VIRGIN ISLANDS CORP., et al., Defendants**

Master Docket No. SX-05-CV-799, Individual Docket Nos. SX-05-CV-812, SX-05-CV-806, SX-05-CV-847, SX-05-CV-846

Superior Court of the Virgin Islands

Division of St. Croix

July 2, 2010

THOMAS ALKON, ESQ., Law Offices of Thomas Alkon, Christainsted, USVI, *Attorney for Plaintiffs.*

GORDON C. RHEA, ESQ., JERRY HUDSON EVANS, ESQ., Richardson, Patrick, Westbrook & Brickman, LLC, Mt. Pleasant, SC, *Attorneys for Plaintiffs.*

BRITAIN H. BRYANT, ESQ., Bryan, Barnes, Beckstedt & Blair, LLP, Christiansted, USVI, *Attorney for Defendant Hess Corporation.*

JAMES CRAWFORD ORR, ESQ., CAROLYN O'CONNOR ESQ., Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, NJ, *Attorney for Defendant Hess Oil Virgin Islands Corp.*

WILLOCKS, *Judge*

## MEMORANDUM OPINION

(July 2, 2010)

Defendant Hess Oil Virgin Islands Corporation (HOVIC) is a corporation which owned and operated an oil refinery from 1965 to 1998 on St. Croix, Virgin Islands of the United States. Defendant HOVIC was a wholly-owned subsidiary of Defendant Amerada Hess Corporation (now Hess Corporation) from 1965 to 1998. During that period of time,

Defendant HOVIC purchased or leased catalyst from various manufacturers for use in the oil refining process.

Plaintiffs, John Bully, Alexander Emile, Richard Maxwell, and Julien McSween were employees of contractors such as Litwin, Riggers and Erectors, and Virgin Islands Industrial Maintenance Corporations, all of whom Defendant HOVIC retained to conduct catalyst work at the Refinery. Plaintiffs claim that as a result of the exposure to catalyst, they developed mixed dust pneumoconiosis.

Plaintiff John Bully loaded and unloaded catalyst in the Platformer units, Desulfurization units, and Sulfur and Beavon Units. He also swept up spilled catalyst and entered the reactors to level catalyst and chip spent catalyst. It is estimated that he worked with catalyst on over 50 occasions from 1974 through the early part of 1990s.

Plaintiff Alexander Emile worked with catalyst from 1989 through 1994. He chipped spent catalyst in many of the Desulfurization units and cleaned out the inside of reactors.

Plaintiff Richard Maxwell loaded and unloaded catalyst and went inside reactors in the Platformer and Desulfurization units from the early 1970s to around 1995.

Plaintiff Julien McSween worked with catalyst from 1988 to around 1995. He opened fresh catalyst and swept and shoveled up catalyst spills. After the unloading of the catalyst, he sealed up the drums of spent catalyst.

Defendants vigorously challenge the admissibility of the testimony of Dr. Daniel Teitelbaum and have requested a *Daubert* Hearing, pursuant to *Daubert v. Merell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The Court granted Defendants' Motion for a *Daubert* Hearing.[1] At the *Daubert* Hearing, Plaintiffs called Dr. Teitelbaum and Defendants called Dr. David Alan Galbraith. Dr. Galbraith is an urgent care physician at the Alto Medical Foundation in the Silicon Valley, and a consultant with the Chemrisk Company in San Francisco, where he evaluates workers who are at risk or already exposed to chemicals and evaluates the circumstances of those exposures.

---

[1] Defendants filed their motion "Hess Oil Virgin Islands Corp. and Hess Corporation's Brief and Motion in Limine to Exclude the Testimony of Daniel T. Teitelbaum, M.D. and Request for Hearing" on October 1, 2009. Through no fault of the parties, the *Daubert* Hearing was heard on May 11-12, 2010.

36

■ Pursuant to the Federal Rules of Evidence, the trial court has been entrusted with the task of being the gatekeeper "to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *See Pineda v. Ford Motor Co.*, 520 F. 3d 237, 243 (3d Cir. 2008) and *Daubert*, 509 U.S. 579 at 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

■ Admissibility under Rule 702 of the Federal Rules of Evidence is governed by Rule 104(a), which requires the judge to conduct preliminary fact-finding to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," and thus enables the judge to exclude evidence presented in the plaintiffs' prima facie case. *Daubert*, 509 U.S. at 592-93. A party who wants to introduce expert testimony bears the burden of showing that a technique is reliable by more than a prima facie showing. *In re Paoli R.R. Yard PCB Litig. [Paoli II]*, 35 F.3d 717, 743 (3d Cir. 1994); *U.S. v. Downing*, 753 F.2d 1224, 1240 n.21 (1985) ("it is plain that the proponent must make more than a prima facie showing . . . that a technique is reliable.").

■ For admissibility, such evidence must satisfy the three major requirements set forth in Rule 702 of the Federal Rules of Evidence.[2] These major requirements are: (1) the proffered expert must be qualified; (2) the expert must give an opinion "about matters requiring scientific, technical, or specialized knowledge" which is obtained or derived from a reliable process or technique; and (3) the expert's testimony must "assist the trier of fact," in other words, it must "fit" the facts of the case. *Pineda*, 520 F. 3d at 244; *Paoli II*, 35 F.3d at 741.

■ The Third Circuit has held that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (noting that Federal Rule of Evidence 702 was amended to include this trilogy and referring to *Brown v. Southeastern Pa. Transp. Auth. (Paoli II)*, 35 F.3d at 741-743 (3d Cir. 1994) (citing *Daubert v. Merrell*

---

[2] Rule 702 of the Federal Rules of Evidence states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).

### Whether Dr. Daniel T. Teitelbaum is Qualified and that Dr. Daniel T. Teitelbaum should be Prohibited from Testifying on Matters in Which he has no Qualifications, Knowledge, Skill, Experience, Training or Education

■ To clear the hurdle of qualification, an expert must "possess specialized expertise." *Schneider ex .rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Rule 702 requires the witness to have "specialized knowledge" regarding the area of testimony. The basis of this specialized knowledge "can be practical experience as well as academic training and credentials."

The Courts have interpreted the specialized knowledge requirement liberally and have stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts.

> In other words, in satisfying the qualification prong, the Courts have used a liberal policy of admissibility illustrated by Rule 702 "a broad range of knowledge, skills, and training qualify an expert." *Paoli II*, 35 F.3d at 741-742; *Hammond v. International Harvester Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87-88 (3d Cir. 1979). See also, *Schneider*, 320 F.3d at 404 (citing *Paoli II*, 35 F.3d at 741-743 (citing *Daubert*, 509 U.S. at 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Belofsky v. General Electric Co.*, 37 V.I. 334, 980 F. Supp. 818 (D.V.I. 1997) (citing *Hammond v. International Harvester Co.*, 691 F.2d 646, 652-53 (3d Cir. 1982)).

■ The Court in *Paoli II* held that:

> "We have held that a broad range of knowledge, skills, and training qualify an expert as such," and have "eschewed imposing overly rigorous requirements of expertise." *Id.; see also Hammond v. International Harvester Co.*, 691 F.2d 646, 653 (3d Cir. 1982) (permitting engineer with sales experience in automotive and agricultural equipment, who also taught high school automobile repair, to testify in products liability action involving tractors). *Paoli II*, 35 F.3d at 741.

■ The Courts has eschewed imposing overly rigorous requirements of expertise and has been satisfied with more generalized qualifications.

While a witness may satisfy the minimum requirements to qualify as an expert, her level of expertise may nevertheless affect the reliability of the expert's opinion. *Paoli II*, 35 F.3d at 741.

■ There is no articulated test, or set of standards, for determining the qualification of a witness as an expert. This determination is left to the discretion of the trial judge. *Government v. Olivera*, 8 V.I. 602, 606 (D.V.I. 1971). "All that is necessary is that the witness has some special or technical knowledge and experience so that he may enlighten laymen (judge and jury) in an area beyond their competence and comprehension." *Id.* Factors to be used in determining expertise qualifications include: education, practical experience, study, research, and general background. *Id.*

Dr. Teitelbaum, is a medical doctor in the field of occupational medicine. He is board certified in medical toxicology by the American Board of Medical Toxicology. He is also board certified in preventive medicine and the subspecialty of occupational medicine by the American Board of Preventive Medicine. He has an extensive background in teaching occupational and environmental health. Dr. Teitelbaum has been involved in the writing and development of several occupational safety and health standards and has consulted with state and federal regulatory agencies. In addition, he has worked as a fellow in the World Health Organization and has done field investigation as well as hands-on patient care for forty years or more.

He has evaluated workers from oil refineries for many kinds of diseases associated with their employment. He has numerous publications in toxicology and belongs to several societies. (See *curriculum vitae*, of Dr. Daniel T. Teitelbaum, M.D.)

■ The Court has reviewed the pertinent documents and cases and has listened to the arguments of the Parties. The Court finds that Dr. Teitelbaum is qualified as a medical doctor, a toxicologist, and an expert in occupational medicine.

## Whether the Opinion of Dr. Daniel T. Teitelbaum, M.D., Meets Rule 702 of the Federal Rules of Evidence in that the Process or Technique Used in Formulating His Opinion is Reliable.

In this instant case, Defendants have moved to exclude the testimony of Dr. Teitelbaum as being scientifically unreliable because:[3]

(1) Dr. Teitelbaum fails to properly employ the correct methodology, differential diagnosis to determine causation;

(2) Dr. Teitelbaum cannot reliably state which level of catalyst exposure result in similar complaints as those allegedly experienced by Plaintiffs;

(3) Dr. Teitelbaum cannot state the duration, frequency, and amount of Plaintiffs' alleged exposure to catalyst and instead, impermissibly makes guesses and estimates;

(4) Dr. Teitelbaum does not know the type of catalyst or its chemical content to which each Plaintiff was exposed;

(5) Dr. Teitelbaum fails to review all available information he admits is necessary to form a reliable opinion, including Plaintiffs' past medical records;

(6) Dr. Teitelbaum fails to rely upon scientific data or studies in generating his opinion which relate to causation due to catalyst exposure or causation in refinery settings.

(7) Dr. Teitelbaum improperly applies the principles and methodology he relies upon.

(8) Dr. Teitelbaum's opinions as to causation relating to Plaintiff Julien McSween are by his own definition, inaccurate and unreliable.

(9) Some of Dr. Teitelbaum's opinions are unsupported and speculative.

(10) Dr. Teitelbaum should be prohibited from testifying about matters to which he has no qualifications, knowledge, skill, experience, training, or education.

(11) If Dr. Teitelbaum is permitted to testify, any opinions or testimony as to alleged silica or asbestos exposure should be ex-

---

[3] Defendants filed their motion, "Hess Oil Virgin Islands Corp. and Hess Corporation's Brief and Motion in Limine to Exclude the Testimony of Daniel T. Teitelbaum, M.D. and Request for Hearing" on October 1, 2009.

cluded as Dr. Teitelbaum opines that any exposure is not related to Plaintiffs' diagnosis in this matter.

Plaintiffs responded to Defendants' Motion,[4] and Defendants in their reply argued several issues and sub-issues that were somewhat different to the initial motion.[5]

██ To determine the second prong of Rule 702 of the Federal Rule of Evidence, the Court must determine whether "the process or technique the expert used in formulating the opinion is reliable." *Paoli II*, 35 F.3d at 742. The Supreme Court in *Daubert* agreed with the Third Circuit's basic holding in *Downing* that an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable. *See Daubert*, 509 U.S. at 592. Under the Rules of Evidence, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Downing*, 753 F.2d at 1237.

██ In reaching that decision of reliability, the Court must consider several factors: (1) whether a method consists of a testable hypothesis; (2)

---

[4] Plaintiffs' Response in Opposition to Hovic and Hess Corporation's Motion to Limine to Exclude the Testimony of Daniel T. Teitelbaum, M.D.

[5] See Defendants' Reply to Plaintiffs' Opposition to Their Motion *in Limine* to Exclude to Exclude the Testimony of Daniel T. Teitelbaum, M.D.

 (1) Plaintiffs have failed to demonstrate that Dr. Teitelbaum relies upon a flawed methodology based upon incomplete information.

 (2) Dr. Teitelbaum does not employ the correct methodology to determine causation

 (3) Dr. Teitelbaum's opinion should be excluded because he cannot reliably state which levels of catalyst exposure results harm and he cannot testify as to the duration, frequency and amount of Plaintiffs' alleged exposure to catalyst

 (4) Dr. Teitelbaum's Opinion as to the type of catalyst or its chemical content to which each plaintiff was exposed is unreliable and must be excluded.

 (5) Plaintiffs failed to offer any evidence that Dr. Teitelbaum reviewed all available relevant information.

 (6) Dr. Teitelbaum fails to rely upon any accepted scientific data or studies in generating his opinion which relate in causation due to catalyst exposure or causation in refinery settings.

 (7) Dr. Teitelbaum's citation to Honma does not assist his opinion.

 (8) Dr. Teitelbaum's unsupported and speculative "opinions" should be excluded.

 (9) Dr. Teitelbaum opined that any exposure to asbestos or silica is not substantially related to Plaintiffs' diagnosis which he attributes primarily to catalyst dust.

41

whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put. *See Pineda*, 520 F.3d at 247-248; 47 V.I. at 127; *Byers*, 35 V.I. at 246, 941 F. Supp. at 516.

This list is non-exclusive, and each factor need not be applied in every case. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999). In creating these standards, the *Daubert* Court required trial courts to consider the above factors in their totality. *Daubert*, 509 U.S. at 593. No one factor is dispositive.

As such, the Court's inquiry must focus solely on principles and methodology, not on the conclusions generated therefrom. *Daubert*, 509 U.S. at 595.

As stated by the Court in *Turbe v. Lynch Trucking*, 41 V.I. 146 (1998):

> These factors should not, however, obscure the fact that the Court's gatekeeper role is a flexible one. The factors are simple useful sign-posts, not dispositive hurdles that a party must overcome in order to have an expert testimony admitted. *Daubert*, 509 U.S. at 594.

The Third Circuit Court of Appeals has explained that an expert opinion cannot be speculative: "Situations in which the failure to qualify the opinion have resulted in exclusion are typically those in which the expert testimony is speculative, using such language as 'possibility.' " *Schulz v. Celotex Corp.*, 942 F.2d 204, 208 (3d Cir. 1991) (discussing level of certainty required for expert medical opinions); *see also Holbrook v. Lykes Bros. S.S. Co. Inc.*, 80 F.3d 777, 784 (3d Cir. 1996) ("A determination that the expert has good grounds assures that the expert's opinions are based on science rather than 'subjective belief or unsupported speculation.' ") (quoting *Daubert*).

### Whether Plaintiffs Have Failed to Demonstrate that Dr. Daniel T. Teitelbaum Relies Upon a Flawed Methodology Based Upon Incomplete Information.

Defendants argue that the "Plaintiffs have failed to demonstrate that Dr. Teitelbaum relies upon a flawed methodology based upon incomplete

42

information." Defendants claim that Dr. Teitelbaum failed to consider the entire record of the four Plaintiffs, failed to conduct a differential diagnosis and used parameters that were not wholly accepted.

██ The scientific methodology employed by physicians, specifically, when determining the cause of an illness or medical condition is referred to as a differential diagnosis. This method involves performing physical examinations, taking medical history, and utilizing laboratory tests. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999). However, it is a requirement that the experts rule out the obvious alternative. *Id.* at 155, Dr. Teitelbaum in his report stated:

> While all of these documents would enhance my understanding of the exposures at Hess/HOVIC, and would clarify some fine points of the cases that are now uncertain, the available information is more than sufficient for me to reach conclusions about the illness suffered by these workers and the relationship of these illnesses to the exposures they underwent as contractor employees at Hess/HOVIC. I set out the conclusions in this report to a reasonable medical probability. (See Letter from Dr. Teitelbaum to Gordon Rhea, Esquire at 3 (July 26, 2005).

██ In addition, Dr. Teitelbaum testified at the *Daubert* Hearing that he conducted a differential diagnosis and discussed the procedure which constituted differential diagnosis. (See Transcript of May 11-12, 2010 *Daubert* Hearing at 31:11-36:3, 41:22-52:24.) Based upon the review of the record, documents submitted, and testimony at the hearing, the Court finds that Dr. Teitelbaum: examined Plaintiffs; reviewed the records of Plaintiffs; conducted pulmonary function tests; sent the pulmonary function studies to Dr. Maxvin; had x-rays conducted on Plaintiffs; had the x-ray reviewed; conducted pathology and biopsies; and reviewed the literature in the field and excluded other possible alternatives. This was done for each of the four Plaintiffs.

██ The Court in *Paoli II* has held that the taking of medical histories, utilizing laboratory tests, or basing an analysis on other reliable sources provide significant evidence of a sufficient differential diagnosis. 35 F.3d at 760-62.

██ As such, this Court finds that a differential diagnosis was done on each Plaintiff. The effectiveness or correctness of the differential diagnosis or the disagreement among experts are matters that go to the

weight of the evidence and not the admissibility. Those matters are for the trier of fact.

Defendants also claim that Dr. Teitelbaum failed "to review the entire record and to take into consideration the past medical records and consider the diagnosis of Plaintiffs' past treating physicians who have never diagnosed Plaintiffs with a mixed dust pneumoconiosis caused by catalyst exposure." However, the record does not support this contention by Defendants. The record clearly states:

Q. In 2008. All right. So you're not practicing medicine, you're not an epidemiologist, you said you're not a B-reader and you're not a process engineer. Did you basically consider the medical records from the treating doctors and the contractors and the infirmary nurses or doctors when looking at these past medical records you said you considered.

A. Yes.

Q. And did you consider those to be worthless?

A. No. On the contrary, some of them actually showed significant disease. Mr. Maxwell had evidence of pulmonary disease two years before I ever saw him.

Q. And did you consider the pulmonary function tests that were given by their employers or their medical departments to be worthless.

A. I didn't think any of them were worthless. They were very helpful. (See Transcript of May 11-12, 2010 *Daubert* Hearing at 72:1)

Dr. Teitelbaum also testified that:

Q. Once they were selected, though, were you able to get medical records from their physcians?

A. Yes, I did. I got the medical records from their past physicians and I got the medical records which had been—limited medical records which had been developed at the refinery over the years.

Q. Did you take those into account in reaching an ultimate decision?

A. Yes. Because I saw the patients, came back, saw the four patients again, repeated my examinations, took additional his-

44

tory, reviewed all of the information that came from additional medical records, some had been deposed before that time. I was able to review all of their depositions for concordance with what they told me. I had received by that time some additional exposure information, additional material safety data sheets so that I had a much better picture of what had gone on with these additional data. (See Transcript of May 11-12, 2010 *Daubert* Hearing at 54:14.)

The Court finds that Dr. Teielbaum reviewed entire records, took into consideration the past medical records and considered the diagnosis of Plaintiffs' past treating physicians who have never diagnosed Plaintiffs with a mixed dust pneumoconiosis caused by catalyst exposure.

### Dr. Daniel T. Teitelbaum's Opinion Should be Excluded Because He Cannot Reliably State Which Levels of Catalyst Exposure Result Harm and He Cannot Testify as to the Duration, Frequency, and Amount of Plaintiffs' Alleged Exposure to Catalyst

Defendants have contended that Dr. Teitelbaum should not be allowed to testify because he cannot state with reliability, which level of catalysts exposure result in similar complaints as those experienced by Plaintiffs. Plaintiffs counter that Dr. Teitlebaum's opinion should not be excluded because he cannot "state with mathematical precision the exact levels of catalyst exposure to cause Plaintiffs' systems." Plaintiffs further argue that "before forming his causation opinion, Dr. Teitelbaum thoroughly examined the totality of the evidence available at this time and came to his conclusion to a reasonable medical probability."

Defendants also argue, that Dr. Teitelbaum cannot state with reliability the frequency, duration, and amount of time that Plaintiffs were exposed to the catalyst. In addition, Defendants cite the case of *National Bank of Commerce v. Associated Milk producers*, 22 F. Supp. 2d 942 (8th Cir. 1998). In that case, the court excluded the testimony of Dr. Teitelbaum because he could not reliably state with the duration, frequency, and amount of Plaintiffs alleged exposure.

The Court has reviewed the *National Bank of Commerce v. Associated Milk Producers* and finds it informative, but neither analogous, nor persuasive. Although some facts *National Bank of Commerce* are similar,

there are far too many facts that differ with this instant case for this Court to find it persuasive.

Defendants also argue that Dr. Teitelbaum does not know the type of catalyst or its chemical content to which each Plaintiff was exposed. In response, Dr. Teitelbaum testified at the *Daubert* Hearing that:

Q. Okay. And would you agree that the crude oil that comes Into the refinery comes from all different places in the world; and you would expect to have different properties in the spent catalyst, depending on what the catalyst was used for and the processing or the refining of the crude oil, isn't that true?

A. No, I don't think that's true. I think that the concentration of metals that are found may vary depending on where the crude oil comes from, but the scope and the range of metals are pretty much the same.

Plaintiffs responded by stating that Dr. Teitelbaum "drew his conclusion after reviewing relevant documents detailing the contents of the very catalysts involved in this litigation." Defendants argue in their response that: "What Plaintiffs failed to note is that different parts of the refinery utilize different types of catalysts and some catalysts are similar in nature, but different in composition."[6]

Defendants also argue that Dr. Teitelbaum fails to rely upon scientific data or studies in generating his opinion which relate to causation due to catalyst exposure or causation in refinery settings. According to Defendants, Dr. Teitelbaum in his deposition "acknowledges that he was unable to locate any study that linked catalyst exposure to mixed dust pneumoconiosis, which is what Plaintiffs are diagnosed with. (See Defendants' Brief and Motion to Exclude the Testimony of Daniel T. Teitelbaum, M.D. at 16.)

*Daubert* teaches that a judge should find an expert opinion reliable under FED. R. EVID. 702 if it is based on "good grounds," i.e., if it is based on reliable and replicable methods and procedures. A judge may find that an expert has good grounds to hold his or her opinion even though the judge thinks that the opinion is incorrect. *Paoli II*, 35 F.3d at 744. The Supreme Court stated that "the focus . . . must be solely on principles and

---

[6] Defendants' Reply to Plaintiff's Opposition to Their Motion In Limine to Exclude the Testimony of Daniel T. Teitelbaum, M.D. at 17.

methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. The primary limitation on the judge's admissibility determination is that the judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process that renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his or her conclusions. *Paoli II*, 35 F.3d at 746.

In *Daubert*, the Supreme Court held that a District Court, when presented with a proffer of expert "scientific" testimony, must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," by considering all relevant factors that may bear on the reliability of the proffered evidence. 113 S. Ct. at 2796-97; *Paoli II*, 35 F.3d at 742. Scientific evidence is deemed sufficiently reliable if the expert has "good grounds" for his or her testimony, *i.e.*, the expert's opinions are "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.' " *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 113 S. Ct. at 2795). We have cautioned, however, against applying the reliability requirement too strictly, explaining that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. The ultimate touchstone [of admissibility] is helpfulness to the trier of fact." *Id.* at 744 (internal quotations and citation omitted).

Many of the issues raised in this section are a question of weight, not admissibility. *Floorgraphic, Inc. v. News America Marketing In-Store Service, Inc.*, 546 F. Supp. 2d 155, 169 (D.N.J. 2008). In addition, as stated above, where experts differ on issues, that is a matter for the trier of fact to decide.

This is simply not a case where an expert offers opinion completely devoid of any factual basis. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 754-756 (3d Cir. 2000). Dr. Teitelbaum did not engage in unsupported speculation. *See Daubert* 509 U.S. at 590. Rather, the Court finds that Dr. Teitelbaum's conclusions were based on good grounds.

One can argue, that Dr. Teitelbaum's opinion is based on shaky factual assumptions. However, the "grounds for the expert's opinion merely have to be good; they do not have to be perfect." *Paoli*, 35 F.3d at 744. As the Supreme Court has instructed: "vigorous cross-examination, presentation of contrary evidence, and careful instruction on

47

the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

The Court has reviewed all the arguments, voluminous record, relevant information and cases and finds that Dr. Teitelbaum passes the second threshold and meets the requirements of FED. R. EVID. 702 and the standards enunciated by the Supreme Court in *Daubert*.

### The Tribunal Should Prohibit the Testimony of Dr. Daniel T. Teitelbaum in Relation to His Unsupported and Speculative Opinions

Defendants have stated that Dr. Teitelbaum's opinions are unsupported and speculative. Defendants appear to argue that if the expert witness does not use the "talismanic phrase" "reasonable degree of medical certainty", that the Court must exclude that witness opinion. However, within Defendant's same Motion, they argue or seem to imply the reverse.[7] They seemingly argue that because an expert witness says that it is within a degree of medical certainty, does not automatically means that it is so.

 Nevertheless, the failure to articulate the talismanic phrase "reasonable degree of medical certainty" is not grounds for exclusion unless an analysis of the testimony itself shows that it is not beyond a degree of medical certainty. *Schultz v. Colorox Corp.*, 942 F.2d 204, 208 (3rd Cir. 1991).

After a review of the relevant document and the testimony and deposition, the Court finds that although Dr. Teitelbaum did not use the talismanic phrase "reasonable degree of medical certainty" his statements were tantamount to it.

Defendants have also contended that Dr. Teitelbaum utilized flawed methodology in interpreting the PFT results by utilizing parameters not widely accepted by the medical community.

 The standard for reliability is not "widely accepted" but generally accepted. *See Pineda* 520 F.3d at 247-248. Defendants are attempting to use the two words as one of the same. The two words are not the same.

 In addition, both the Courts in *Daubert* and *Downing* have held that although peer review and general acceptance are not necessary

---

[7] See Defendants' Brief and Motion in Limine to Exclude the Testimony of Daniel T. Teitelbaum, M.D. and Request for a *Daubert* Hearing at 5.

conditions for reliability, they are factors a district court can take into account in assessing reliability. *See Downing*, 753 F.2d at 1238.

### If Dr. Daniel T. Teitelbaum is Permitted to Testify, Any Opinions or Testimony as to Alleged Silica or Asbestos Exposure Should Be Excluded as Dr. Daniel T. Teitelbaum Opines that Any Exposure is not Related to Plaintiffs' Diagnosis in This Matter.

Plaintiffs argue that asbestos and silica exposure are a contributing factor, based upon the testimony of Dr. Teiltebaum.

Q. But the disease that you did diagnose is mixed dust pneumoconiosis.

A. With the contributing factors.

Q. Understood.

A. I'm not sure that's clear, and I want to make sure it's clear. That the diagnosis that I have made is mixed dust pneumoconiosis due to catalyst dust components. And in some individuals, additional contributing factors of asbestos and silica.

Defendants offer a compelling argument in their response to Plaintiffs' Opposition to Defendants' Motion to Exclude. Defendants stated that "Plaintiffs fail to offer any evidence that the plaintiffs Dr. Teitelbaum refers to in the deposition testimony cited include the four Plaintiffs that are subject of this litigation."[8] The issue then becomes one of relevance; and, as such, the Court will make its appropriate ruling at the appropriate time.

### Testimony of Dr. Galbratih

At the *Daubert* hearing, Dr. Galbraith testified that he has reviewed the deposition transcript and opinions of Dr. Daniel Teitelbaum as well as Dr. Teitelbaum's supplemental reports concerning the four Plaintiffs. In addition, Dr. Galbraith also reviewed the expert reports for the individuals in this matter and the testimony of each Plaintiff in the above matter. Dr. Galbriath also reviewed some of the exhibits where medical records were provided. (See Transcript of May 11-12, 2010 *Daubert* Hearing at 118:1.) Dr. Galbraith acknowledges that he did not review all the medical

---

[8] See Defendants' Reply to Plaintiffs' Opposition to Their Motion in *Limine* to Exclude the Testimony of Daniel T. Teitelbaum, M.D.

records, only those that were available to him. (See Transcript of May 11-12, 2010 *Daubert* Hearing at 118:19.) Dr. Galibraith also testified that he also reviewed the applicable literature to the issues involved. Based upon this information, Dr. Galibraith determined to a reasonable degree of medical certainty, that the reliability and trustworthiness of Dr. Teitelbaum's diagnosis of mixed dust pneumoconiosis of the four Plaintiffs is flawed and unreliable.

> "Well, I found that the opinions as stated by Dr. Teitelbaum were not supported, in my opinion to a reasonable degree of medical certainty and furthermore, were not performed in a way that would be consistent with medical standards." (See Transcript of May 11-12, 2010 *Daubert* Hearing at 120:12.)

Further, Dr. Galbraith testified that:

> "I did not find that any of Plaintiffs had findings that were evidence to support a conclusion of a diagnosis of mix dust pneumoconiosis in any circumstance." (See Transcript of May 11-12, 2010 *Daubert* Hearing at 120:23.)

Dr. Galbraith, Defendant's expert witness, is critical of the manner in which the differential diagnosis was done by Dr. Teitelbaum. Dr. Galbraith argues that Plaintiffs' expert witness "misinterpreted the clinical data," and ignored certain pieces of clinical data. (See Transcript of May 11-12, 2010 *Daubert* Hearing at 120:23.)

The Courts have held that the fact that experts have differing opinions is a matter for the jury. In this matter, both experts disagree as to the conclusions and appropriate method used. After review of the documents and listening to the testimony, this Court finds that the difference in the opinions of the experts is a matter left to the jury. The Court in *Johnson v. Vane Line Bunkering*, 2003 U.S. Dist. LEXIS 23698, at *18, n.3 (E.D. Pa. Dec. 30, 2003) has held:

> If disagreements on particular points between proposed experts and others in their field were a proper basis for questioning the reliability and relevance of the methods employed by the experts, it is likely that very few expert opinions would be admissible in trial. *Johnson v. Vane Line Bunkering, Inc.*, 2003 U.S. Dist. LEXIS 23698, at *18, n.3 (E.D. Pa. Dec. 30, 2003).

### Whether the Testimony of Dr. Daniel T. Teitelbaum Fits the Facts of the Case

██ The third requirement of FED. R. EVID. 702 is to ensure that the evidence is relevant or "fits" under the facts of the case. *Daubert*, 113 S. Ct. at 2795-96. There must be a valid connection between the expertise in question and the inquiry being made in the case. *Paoli II*, 35 F.3d at 743. When dealing with "scientific" evidence, this element is satisfied if there is a "connection between the scientific research or test result to be presented, and particular disputed factual issues in the case." *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985); *see also Paoli II*, 35 F.3d at 742-43.

██ In addition to reliability, FED. R. EVID. 702 requires that the expert's testimony must assist the trier of fact. Admissibility depends in part on "the proffered connection between the research or test result to be presented and particular disputed factual issues in the case." *Downing*, 753 F.2d at 1237. In *Downing*, the Court of Appeals recognized that expert testimony was only helpful to the trier of fact if it addressed factual issues implicated by the facts of the particular case. *See Daubert*, 509 U.S. at 591-95 (explicitly adopting the "fit" requirement of *Downing*).

The Court, after reviewing the reports, transcripts, testimonies and other related documents, find that the testimony of Dr. Teitelbaum will assist the trier of facts and therefore "fits" the facts of the case. Ergo, the Court finds that Dr. Teitelbaum has cleared the third hurdle of *Daubert*.

### CONCLUSION

The Court decision to deny Defendants' Motion to Exclude the testimony of Dr. Teitelbaum was a difficult one. Primarily because of the excellent credentials of the Parties' expert witnesses. Although the Court is convinced that it has correctly assessed the admissibility of Plaintiffs' expert witnesses, after listening to Plaintiffs' and Defendants' expert witnesses, reviewing the presence or absence of scientific literature and most importantly, the process itself, which was guided by very able and competent attorneys, the Court must concede, the decision was not an easy one. Both sides were very competent and vigorously defended their positions.

Nevertheless, the Court will deny Defendants' Motion in *Limine* to Exclude the Testimony of Daniel T. Teitelbaum, M.D.